# UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF DELAWARE

| | |
|---|---|
| WATER ISLAND MERGER ARBITRAGE INSTITUTIONAL COMMINGLED MASTER FUND, LP, on behalf of themselves and all others similarly situated, <br><br>                 Plaintiffs, <br><br>    vs. <br><br> CORNERSTONE BUILDING BRANDS, INC.; GEORGE L. BALL; GARY L. FORBES; JOHN J. HOLLAND; WILLIAM E. JACKSON; WILBERT W. JAMES JR.; DANIEL JANKI; JOHN KRENICKI JR.; ROSE LEE; JAMES METCALF; TIMOTHY O'BRIEN; JUDITH REINSDORF; NATHAN K. SLEEPER; JONATHAN L. ZREBIEC; JEFFREY S. LEE and ALENA S. BRENNER, <br><br>                 Defendants | No. _____ <br><br><br> JURY TRIAL DEMANDED <br><br> CLASS ACTION |

## CLASS ACTION COMPLAINT

## TABLE OF CONTENTS

I.     INTRODUCTION ......................................................................................................2

II.    JURISDICTION AND VENUE .................................................................................4

III.   PARTIES ....................................................................................................................5

     A.    Plaintiff ...........................................................................................................5

     B.    Defendants ......................................................................................................6

          1.    Cornerstone ........................................................................................6

          2.    The Special Committee .......................................................................6

          3.    The Other Cornerstone Board Members ..............................................7

     C.    Relevant Non-Parties ....................................................................................10

IV.   FACTUAL BACKGROUND ....................................................................................11

     A.    CD&R Controlled Cornerstone's Predecessor Entity .............................11

     B.    The NCI-Ply Gem Merger .............................................................................12

     C.    The 2018 Stockholders Agreement ...............................................................13

     D.    CD&R Initiates Negotiations to Take Cornerstone Private .......................15

     E.    The Special Committee is Formed .................................................................16

     F.    Centerview is Selected as a Financial Advisor .............................................18

     G.    Defendants and CD&R Continue to Engage in Merger Negotiations in
          Violation of the Standstill Provisions ...........................................................18

     H.    The Special Committee Approves A Waiver of the Standstill Provisions ...........23

V.    THE MATERIAL MISSTATEMENTS AND OMISSIONS OF MATERIAL
     FACT IN THE PROXY ............................................................................................25

     A.    The Proxy Misstated CD&R's Offers to Acquire Cornerstone in Violation
          of the Standstill Provisions ...........................................................................25

     B.    The Proxy Misstated Cornerstone's Financial Projections By Omitting
          That They Were Revised Downward at CD&R's Direction .................................33

C.      The Proxy Misstated Cornerstone's Valuation By Failing to Account for the Coil Coaters Transaction.......................................................................41

VI.     LOSS CAUSATION............................................................................................44

VII.    INAPPLICABILITY OF STATUTORY SAFE HARBOR ...............................44

VIII.   CLASS ACTION ALLEGATIONS ...................................................................45

COUNT I  Against Cornerstone, the Board Defendants and Officer Defendants for Violations of Section 14(a) of the Exchange Act and Rule 14a-9 Promulgated Thereunder .........................................................................................................46

COUNT II  Against the Board Defendants and Officer Defendants for Violations of Section 20(a) of the Exchange Act .....................................................................48

IX.     PRAYER OF RELIEF .........................................................................................49

X.      JURY DEMAND ................................................................................................50

Plaintiff Water Island Merger Arbitrage Institutional Commingled Master Fund, LP, brings this action (the "Action") on behalf of itself and a class (the "Class") consisting of all former shareholders of Cornerstone Building Brands, Inc. ("Cornerstone" or the "Company") that were harmed by Defendants' actions described herein against: (i) Cornerstone; (ii) members of Cornerstone's Board of Directors (the "Board Defendants"); and (iii) certain Cornerstone executives (the "Officer Defendants" and together with Cornerstone and the Board Defendants, "Defendants"), for their violations of Sections 14(a) and/or 20(a) of the Securities Exchange Act of 1934 (the "Exchange Act"), 15 U.S.C. §§ 78n(a), 78t(a), and SEC Rule 14a-9, 17 C.F.R. § 240.14a-9 promulgated thereunder based on the deficient Definitive Proxy Statement ("Proxy") filed on May 24, 2022 in connection with the "take-private" transaction (the "Merger") of Cornerstone by Clayton, Dubilier & Rice, LLC (together with its affiliates, "CD&R").

Plaintiff's allegations are based upon personal knowledge as to itself and its own acts and upon information and belief as to all other matters. Plaintiff's information and belief is based upon, *inter alia*, the investigation conducted by or at the direction of undersigned counsel for Plaintiff. This investigation includes, among other things, a review and analysis of: (i) publicly filed pleadings in other proceedings; (ii) press releases, presentations, and other public statements issued by Cornerstone; (iii) Cornerstone's filings with the U.S. Securities and Exchange Commission ("SEC"), including its Proxy issued in connection with the Merger; (iv) media and analyst reports about the Company; and (v) other information and data concerning Cornerstone.[1] The investigation is ongoing, and many of the relevant facts are known only by Defendants or are exclusively within Defendants' custody or control.

---

[1] Certain documents referenced herein are cited in consolidated lawsuits contesting the Merger filed in the Delaware Court of Chancery captioned *Firefighters' Pension Sys. of the City of Kansas City, Mo. Trust v. Affeldt*, C.A. No. 2023-0091 (Del. Ch.) and *Whitebark v. Clayton*

## I.   **INTRODUCTION**

1.     This Action arises out of the "take-private" transaction of Cornerstone announced by the Company on March 7, 2022, and the materially false and misleading Proxy issued in connection with the transaction.  Prior to the Merger, CD&R controlled Cornerstone through its ownership of 49% of the Company's outstanding common stock and its control over Cornerstone's Board of Directors (the "Board").  Pursuant to an Agreement and Plan of Merger dated March 5, 2022 (the "Merger Agreement"), CD&R acquired the Cornerstone stock it did not already own for $24.65 per share in cash (the "Merger Consideration").  The Merger had an enterprise value of approximately $5.8 billion.

2.     Cornerstone was formed in November 2018, when the CD&R-controlled entities, Ply Gem Parent, LLC ("Ply Gem"), and NCI Building Systems, Inc. ("NCI") merged in a transaction valued at approximately $2.6 billion (the "NCI/Ply Gem Merger").  The combined company changed its name to Cornerstone and began trading on the New York Stock Exchange ("NYSE") on May 24, 2019 under ticker symbol "CNR."  Cornerstone is the largest manufacturer of exterior building products in North America and is engaged in both the new construction and the repair and remodel markets for residential and commercial customers.

3.     Following the NCI/Ply Gem Merger, CD&R controlled 49% of Cornerstone's outstanding shares of common stock and a majority of Cornerstone's Board.  As part of the NCI/Ply Gem Merger, CD&R also entered into a stockholders agreement (the "2018 Stockholders Agreement") that gave CD&R the power to appoint directors to Cornerstone's Board proportionate to the amount of Cornerstone stock CD&R held.  CD&R was also given

_Dubilier & Rice, LLC_, C.A. No. 2023-0092 (Del. Ch.), which were unsealed on April 20, 2023. These references are to internal Cornerstone documents produced in these cases pursuant to books and records demands under 8 Del. C. § 220.  All emphases herein are added unless otherwise noted.

consent rights over significant Company transactions such as acquisitions and divestitures, provided CD&R held at least 25% of Cornerstone stock with voting interests.

4.       The 2018 Stockholders Agreement also contained standstill provisions (the "Standstill Provisions" or "Standstill") that ***expressly prohibited*** CD&R from (i) acquiring, offering, or proposing to acquire additional Cornerstone stock, or (ii) making any statement, proposal, or offer to the Cornerstone Board or its representatives concerning a business combination or merger.  The Standstill Provisions were in force when CD&R and Cornerstone negotiated the terms of the Merger.

5.       CD&R began violating the Standstill Provisions no later than September 16, 2021 when it contacted the Cornerstone Board to initiate a take-private transaction of the Company. On September 21, 2021, the Board formed a special committee of Cornerstone directors (the "Special Committee") in response to CD&R's outreach on a transaction.  The five-member Special Committee included three directors who served on the special committee that negotiated the NCI/Ply Gem Merger.   Rather than enforcing the Standstill Provisions in the 2018 Stockholders Agreement, the Special Committee ***allowed CD&R to violate the Standstill*** and engaged with CD&R on its transaction offers over the next five months.

6.       During the course of Merger negotiations, Cornerstone management presented the Special Committee and its financial advisor on the CD&R Merger with a series of five-year Cornerstone financial projections.   These Company projections were used by the Special Committee's financial advisor to value Cornerstone's share price and assess the fairness of the Merger Consideration offered by CD&R.   Unbeknownst to shareholders, ***Cornerstone management revised a set of Company projections downward in two key operating segments after CD&R advocated for such a downward revision in these exact same segments***.  The

revisions helped to support a lower per share price for CD&R's acquisition of Cornerstone's public shares.

7.      Concurrent with the negotiations between Cornerstone and CD&R on the Merger, Defendants were actively seeking to divest Cornerstone's lucrative metal coil coatings business. In April 2022, Cornerstone entered into an agreement to sell the business for $500 million. Despite this agreement, the discounted cash flow analysis prepared by Cornerstone's financial advisor to value the Company and evaluate CD&R's Merger Consideration failed to account for the proceeds from the coil coatings business.

8.      On May 24, 2022, Defendants issued the Proxy, which contained materially false and misleading statements that deprived Plaintiff and the Class of their right to cast a fully informed vote on the Merger. The Proxy misrepresented and omitted material facts concerning, among other things, (i) the scope of the Standstill Provisions and the fact that CD&R made actual offers and proposals to acquire Cornerstone in breach of the Standstill Provisions; (ii) the fact that Cornerstone's financial projections used by its financial advisor in connection with Merger negotiations were revised downward at CD&R's direction; and (iii) Cornerstone's parallel sales process to divest its metal coil coatings business for $500 million and Defendants' failure to account for this sale in the valuation of the Company.

9.      Defendants violated Sections 14(a) and 20(a) of the Exchange Act given these material misstatements and omissions of material fact in the Proxy.

## II.      JURISDICTION AND VENUE

10.      The claims asserted herein arise under Sections 14(a) and 20(a) of the Exchange Act, 15 U.S.C. §§ 78n(a), 78t(a), and Rule 14a-9 promulgated thereunder by the SEC, 17 C.F.R.

§ 240.14a-9.  This Court has jurisdiction over the subject matter of those claims pursuant to 28 U.S.C. §§ 1331 and 1337, and Section 27 of the Exchange Act, 15 U.S.C. § 78aa.

11.     Personal jurisdiction exists over each Defendant either because (i) the Defendant conducts business in or maintains operations in this District or (ii) is an individual who is either present in this District for jurisdictional purposes or has sufficient minimum contacts with this District as to render the exercise of jurisdiction over Defendant by this Court permissible under traditional notions of fair play and substantial justice.

12.     Venue is proper in this District pursuant to 28 U.S.C. § 1391(b) and Section 27 of the Exchange Act, 15 U.S.C. § 78aa.  Venue is also proper in this District because Cornerstone was incorporated in this District during the relevant period.

13.     In connection with the acts alleged in this complaint, Defendants, directly or indirectly, used the means and instrumentalities of interstate commerce, including, but not limited to, the mail, interstate telephone communications and the facilities of the national securities markets.

## III.   **PARTIES**

### A.   **Plaintiff**

14.     Plaintiff Water Island Merger Arbitrage Institutional Commingled Master Fund LP is a hedge fund formed on January 24, 2018 and organized under Delaware law.  Plaintiff is advised by its investment advisor Water Island Capital, LLC, a New York domiciled SEC registered entity.  Plaintiff held and was beneficial owner of 60,414 shares of Cornerstone common stock as of the May 16, 2022 record date ("Record Date") for the Merger and was entitled to vote on the Merger, as set forth in the attached certification.  Plaintiff continued to

hold Cornerstone stock on the closing date of the Merger and suffered damages as a result of the violations of the federal securities laws alleged herein.

**B.     Defendants**

**1.     Cornerstone**

15.     Cornerstone is a Delaware corporation headquartered in Cary, North Carolina. Cornerstone traded on the NYSE under the ticker symbol "CNR" until the Merger closed. Cornerstone was a controlled company, with CD&R owning 49% of the Company's outstanding stock at the time of the Merger.  Cornerstone continues to exist as a wholly owned subsidiary of CD&R.  During the time of the Merger, Cornerstone conducted business through the following three operating segments: (i) Windows Segment, (ii) Siding Segment, and the (iii) Commercial Segment.

**2.     The Special Committee**

16.     George L. Ball was a Cornerstone director from November 2018 through the closing of the Merger.  Mr. Ball was Chairman of the Special Committee, and also served on the Board's Compensation Committee until the Merger closed.

17.     Gary L. Forbes was a Cornerstone director from November 2018 through the closing of the Merger.  Mr. Forbes was also a member of the Special Committee through the closing of the Merger.

18.     John J. Holland was a Cornerstone director from November 2018 until the Merger closed.  Mr. Holland was also a member of the Special Committee through the closing of the Merger, and served on the Board's Nominating and Corporate Governance Committee (the "NCGC") and Audit Committee.

19.     William E. Jackson was a Cornerstone director from May 28, 2020 until the Merger closed.  Mr. Jackson was also a member of the Special Committee.

20.     Judith Reinsdorf was a Cornerstone director from August 19, 2021 until the Merger closed.  Ms. Reinsdorf also served on the Board's Compensation Committee and the Special Committee, which was formed one month after she joined the Board.

### 3.     The Other Cornerstone Board Members

21.     Kathleen Affeldt was a Cornerstone director from November 2018 until the Merger closed.  She has been a director of the post-Merger Company since August 8, 2022.  Ms. Affeldt has a thirty-year affiliation with CD&R, including as a director of several CD&R portfolio companies such as SIRVA, Inc., BTE Technologies, Inc., Sally Beauty Holdings, Inc., NCI, and HD Supply Holdings Inc., for which she earned over $4 million in director fees. During her tenure on the Cornerstone Board, Affeldt served on the NCGC and as Chair of the Compensation Committee.

22.     Wilbert W. James, Jr. was a Cornerstone director from May 23, 2019 until the Merger closed, and has been a director of the post-Merger Company since August 8, 2022.  Mr. James served on the Compensation Committee during his tenure on the Cornerstone Board.

23.     Daniel C. Janki was a Cornerstone director from May 23, 2019 until the Merger closed, and has been a director of the post-Merger Company since August 8, 2022.  CD&R designated Mr. Janki as one of its directors (a "CD&R Investor Director") under the 2018 Stockholders Agreement.  Mr. Janki worked at General Electric Company ("GE") for 29 years between 1992 and July 2021, and as CFO of GE Energy he reported  directly to his co-defendant John Krenicki, Jr. (whom Mr. Janki worked with at GE for 20 years).

24.     John Krenicki, Jr. has been a Cornerstone director since November 2018, and is a director of the post-Merger Company.  During his tenure on the Cornerstone Board, Mr. Krenicki served as Lead Director, Chair of the NCGC and Executive Committee, and on the Compensation Committee.  Mr. Krenicki has been a CD&R partner since 2013 and is CD&R's Vice Chairman.   CD&R designated Mr. Krenicki as a CD&R Investor Director to the Cornerstone Board.  Mr. Krenicki joined CD&R after working at GE between 1984 and 2012, including as CEO of GE Energy from 2005 to 2012, and as Vice Chairman of GE's board.

25.     Rose Lee has been a Cornerstone director and Cornerstone's CEO since September 6, 2021, and has been the CEO and a director of the post-Merger Company since the Merger closed.  As Cornerstone's CEO between September 6, 2021 and the Merger close, Ms. Lee received a $500,000 signing bonus, $1,000,000 base salary and Company equity awards that entitled her to have at least 183,268 shares of Cornerstone common stock cashed out in the Merger.

26.     James S. Metcalf became Cornerstone's CEO after the NCI/Ply Gem Merger closed until his retirement on September 6, 2021.  Between September 6, 2021 and March 31, 2022, Mr. Metcalf served as the Board's Executive Chairman.  Mr. Metcalf was an NCI director from May 23, 2017 until the NCI/Ply Gem Merger, and was NCI's Chairman from January 1, 2018 until the NCI/Ply Gem Merger closed in 2018.  Mr. Metcalf earned over $4.8 million in salary and cash bonuses working at NCI and Cornerstone, and received Company equity awards with grant date fair values of over $7 million.  Mr. Metcalf received over $19 million in the Merger for his Cornerstone shares.

27.     Timothy O'Brien is a CD&R Investor Director who joined Cornerstone's Board in November 2018.  He was a Cornerstone director until the Merger closed, and has been a

director of the post-Merger Company since August 8, 2022.  Mr. O'Brien served on the NCGC during his tenure on the Board.  He has been the President and CEO of CD&R's portfolio company Wilsonart Engineered Surfaces since January 2013.

28.     Nathan K. Sleeper is the CEO of CD&R, which he joined in 2000.  CD&R designated MR. Sleeper as a CD&R Investor Director on Cornerstone's Board.  Mr. Sleeper was a Cornerstone director from November 2018 until the Merger closed and served on the Board's Compensation Committee.  He has been a director of the post-Merger Company since August 8, 2022.

29.     Jonathan L. Zrebiec is a CD&R partner, and joined CD&R in 2004. CD&R designated Mr. Zrebiec as a CD&R Investor Director on Cornerstone's Board.  Mr. Zrebiec was a Cornerstone director from November 2018 until the Merger closed and served on the Compensation Committee.  He has been a director of the post-Merger Company since August 8, 2022.

30.     The defendants identified in paragraphs 16-29 above are collectively referred to herein as the "Director Defendants."

31.     Jeffrey Lee has been Cornerstone's CFO from 2019 through the present.  Before joining Cornerstone, Mr. Lee was the Senior Vice President and CFO of Wilsonart International Holdings LLLC from 2014 to 2019, a position to which he was appointed by CD&R, and reported to Mr. O'Brien (Wilsonart's CEO) and Mr. Krenicki (Wilsonart's Chairman). As Cornerstone's CFO between June 2019 and the Merger, Lee earned more than $5.6 million in base salary, bonus, Company stock and options and other benefits, including, in connection with his agreement to work as Cornerstone's CFO.

32.     Alena S. Brenner has served as Cornerstone's Executive Vice President, General Counsel, and Corporate Secretary from April 2021 through the present.  Ms. Brenner joined the Cornerstone Board on July 25, 2022 and stepped down from the Board on August 8, 2022.

33.     The defendants identified in paragraphs 25, and 31-32 above are collectively referred to herein as the "Officer Defendants."

### C.     Relevant Non-Parties

34.     CD&R is a Delaware limited liability company with offices in New York and London.  CD&R has controlled Cornerstone since 2009, when CD&R acquired a majority interest in Cornerstone's predecessor entity NCI.

35.     CD&R Pisces Holdings, L.P. ("CD&R Pisces") is a Cayman Islands limited partnership through which CD&R beneficially owned approximately 39.1 million shares of Cornerstone stock.  CD&R Pisces was a party to the 2018 Stockholders Agreement.

36.     Clayton, Dubilier & Rice Fund VIII, L.P. ("CD&R Fund VIII") is a Cayman Islands limited partnership through which CD&R beneficially owned approximately 22.8 million shares of Cornerstone stock.  CD&R Fund VIII was a party to the 2018 Stockholders Agreement.

37.     CD&R Friends & Family Fund VIII, L.P. ("CD&R FF Fund VIII") is a Cayman Islands limited partnership through which CD&R beneficially owned 56,940 shares of Cornerstone stock.  CD&R FF Fund VIII was a party to the 2018 Stockholders Agreement.

38.     Camelot Return Intermediate Holdings, LLC ("Parent") was formed on February 22, 2022 as an entity to complete the Merger.

39.     Camelot Return Merger Sub, Inc. ("Merger Sub") was formed on February 22, 2022 as an entity to complete the Merger.  Merger Sub is a direct, wholly owned subsidiary of Parent.

40.     CD&R Pisces, CD&R Fund VIII and CD&R FF Fund VIII are collectively referred to herein as the "CD&R Funds." The CD&R Funds, together with CD&R, Parent and Merger Sub, are collectively referred to herein as "CD&R."

## IV.     FACTUAL BACKGROUND

### A.     CD&R Controlled Cornerstone's Predecessor Entity

41.     CD&R and Cornerstone's predecessor company, NCI, executed an investment agreement on August 14, 2009 (the "2009 Investment Agreement").  Under the 2009 Investment Agreement, CD&R acquired a controlling interest in NCI through its purchase of 250,000 Series B preferred shares from NCI for $250 million.  This represented approximately 68.4% of the voting power of NCI.  Pursuant to the 2009 Investment Agreement, CD&R also appointed three of the six members of NCI's board of directors at the time, including Defendant Sleeper.

42.     On October 20, 2009, CD&R and NCI also entered into a stockholders agreement (the "2009 Stockholders Agreement") that was in effect until 2018.  The 2009 Stockholders Agreement contained certain provisions that gave CD&R further control over NCI.  This included the power for CD&R to appoint the Chairman of the Executive Committee of NCI's board of directors, as well as other NCI board members proportionate to CD&R's share ownership.  Under the 2009 Stockholders Agreement, CD&R also had a consent right over certain NCI actions, including acquiring businesses, selling NCI assets, and increasing the size of NCI's board.

43.     On October 30, 2009, NCI disclosed in its SEC Schedule 14F-1 that after CD&R's appointment of additional directors, CD&R would have "the ability . . . to control the decisions of [NCI's] Board."  On November 10, 2009, CD&R appointed Defendants Affeldt and Zrebiec to NCI's board pursuant to the 2009 Stockholders Agreement.

44.     As of November 2009, NCI's board consisted of nine directors, five of whom were appointed by CD&R (*i.e.*, Defendants Sleeper, Zrebiec, and Affeldt, as well as Lawrence Kremer and CD&R partner James Berges).

45.     Between 2010 and the end of 2017, CD&R sold a portion of its NCI equity stake, but retained the right to appoint four of NCI's twelve directors under the 2009 Stockholders Agreement.  CD&R's five director appointees also remained on the NCI board.  The NCI/Ply Gem Merger, which resulted in the creation of Cornerstone, occurred because of CD&R's control over NCI's board.

**B.     The NCI-Ply Gem Merger**

46.     CD&R owned approximately 70% of Ply Gem following a leveraged buyout of Ply Gem in April 2018.  Several months later, CD&R caused NCI to acquire Ply Gem in the November 2018 NCI/Ply Gem Merger.

47.     The NCI/Ply Gem Merger was an all-stock merger, with NCI as the surviving entity.  On April 11, 2019, NCI announced that it would change its name to Cornerstone.  CD&R owned 49.6% of Cornerstone's common stock upon the closing of the NCI/Ply Gem Merger in November 2018.

48.     CD&R clearly controlled the Cornerstone Board from inception.  Following consummation of the NCI/Ply Gem Merger, six of Cornerstone's eleven directors were appointed by CD&R (*i.e.*, Defendants Krenicki, O'Brien, Affeldt, Sleeper, and Zriebec, as well as Lawrence Kremer).  Defendants Ball and Metcalf were also effectively CD&R director designees, having been appointed as directors of Cornerstone's predecessor company, NCI.

49.     The CD&R-controlled NCI board appointed a special committee in connection with the NCI/Ply Gem Merger (the "NCI Special Committee").  As part of that transaction, the

NCI Special Committee approved a revised stockholders agreement that was executed on November 16, 2018 (the "2018 Stockholders Agreement"). The 2018 Stockholders Agreement was executed between CD&R and Cornerstone and replaced the 2009 Stockholders Agreement between CD&R and NCI.

### C.   The 2018 Stockholders Agreement

50.   The 2018 Stockholders Agreement gave CD&R certain consent rights over Cornerstone's business activities, including significant acquisitions, divestitures, stock issuances, stock repurchases, dividend issuances, or new borrowings. These consent rights allowed CD&R to effectively control Cornerstone's business operations.

51.   Like the 2009 Stockholders Agreement, the 2018 Stockholders Agreement also gave CD&R the right to appoint Cornerstone Board members. Under the 2018 Stockholders Agreement, CD&R was empowered to nominate CD&R director designees proportionate to the amount of stock CD&R owned in Cornerstone.

52.   The 2018 Stockholders Agreement also contained the Standstill Provisions, which significantly restricted CD&R's ability to negotiate mergers or acquisitions involving Cornerstone. The Standstill Provisions served as a mechanism to protect Cornerstone's public shareholders and to ensure they received an adequate control premium in any potential transaction involving Cornerstone.

53.   Section 3.3(a) of the 2018 Stockholders Agreement prohibited CD&R from *acquiring or proposing to acquire* additional shares of Cornerstone common stock. Specifically, Section 3.3(a) stated that, CD&R "shall not, directly or indirectly":

(i)   in any way acquire, offer or propose to acquire, or agree to acquire, in any manner (including by means of merger, consolidation, reorganization, recapitalization or otherwise), Beneficial Ownership of any securities of the Company . . . if immediately following such acquisition or agreement [CD&R] . .

13

. would Beneficially Own . . . more than the Voting Interest or economic interest of the Company that [CD&R] held at Closing . . .  [or]

(ii)   make any statement or proposal to the Board or any of the Company's representatives or stockholders regarding, or make any public announcement, proposal or offer with respect to, any Business Combination, merger, exchange or tender offer, recapitalization or similar transaction or recapitalization of debt.

54.   Thus, Section 3.3(a)(i) prohibited CD&R from making offers or proposals to acquire additional Cornerstone stock "in any manner," including indirect or informal offers or proposals.  Section 3.3(a)(ii) also prohibited CD&R from making any statement or proposal to the Board, any Cornerstone representative, or any Cornerstone stockholder concerning a merger.

55.   Section 3.3(a)(ii) contained an exception that permitted CD&R to "privately communicate" a proposal "to the Board or the [CEO] . . . *as long as such communication would not, and would not reasonably be expected to, trigger public disclosure obligations for any Person*."   That exception does not apply to Section 3.3(a)(i) of the 2018 Stockholders Agreement.

56.   SEC Schedule 13D provides the disclosure requirements applicable to Section 3.3(a)(ii) of the 2018 Stockholders Agreement.  A beneficial owner of 5% or more of a publicly traded security is required under the Exchange Act to file a Schedule 13D with the SEC.  Among other things, a beneficial owner's Schedule 13D filing must include the beneficial owner's plans or proposals concerning a merger or other corporate transaction that would result in a delisting of a security from the exchange on which it trades.

57.   Shareholders must also file an amended Schedule 13D to disclose any material change in the information contained in a prior Schedule 13D.  The SEC's Compliance and Disclosure Interpretations for Schedule 13D state that:

a plan or proposal, as those terms are used in Item 4, is not deemed to exist only upon execution of a formal agreement or commencement of a tender offer,

solicitation or similar transaction.  Generic disclosure . . . must be amended when *the security holder has formulated a specific intention* with respect to a disclosable matter.

Accordingly, as the beneficial owner of 49.6% of Cornerstone's common stock, CD&R had an obligation to update its Schedule 13D once it formed a plan that would or could result in a merger or similar transaction involving Cornerstone.  As detailed below, the Proxy materially misrepresented CD&R's failure to do so, as well as CD&R's blatant violation of the Standstill Provisions when it initiated and engaged in merger negotiations with Defendants.

### D.      CD&R Initiates Negotiations to Take Cornerstone Private

58.     As stated in the Proxy, "[i]n the summer of 2019, CD&R communicated to [Defendant] George L. Ball . . . *CD&R's potential interest in exploring a transaction* in which CD&R would acquire all of the outstanding shares of Company common stock not then-owned by CD&R stockholders."  CD&R indicated at this time that it would be prepared to consider an implied valuation of $10.00 per share of Cornerstone common stock.  Cornerstone viewed CD&R's valuation to be unattractive and the consideration of a transaction terminated.

59.     Discussions between CD&R and Cornerstone on a transaction were re-initiated in the fall of 2021.  On September 16, 2021, Defendant Sleeper contacted Defendant Ball on behalf of CD&R to discuss a transaction involving Cornerstone's remaining shares.  According to the minutes from Cornerstone's Board meeting on September 21, 2021, Defendant Sleeper informed Defendant Ball of "CD&R's interest in determining the Board's receptivity to, and interest in, the possibility of exploring and evaluating a potential transaction in which CD&R, alone or together with other investors, would acquire [Cornerstone]."

60.     Because CD&R had at this point in time formulated an intention that could result in its acquisition of the remaining publicly-held shares of Cornerstone, CD&R was required to

file an amended Schedule 13D. Moreover, because CD&R's outreach to the Cornerstone Board triggered this disclosure requirement, it violated the Standstill Provision in Section 3.3(a)(ii) of the 2018 Stockholders Agreement. It also violated Section 3.3(a)(i) of the 2018 Stockholders Agreement. The Proxy failed to disclose these critical facts and instead misstated CD&R's true intentions by merely representing that Defendant Sleeper discussed CD&R's "potential interest" in acquiring Cornerstone.

###  E.  The Special Committee is Formed

61.   In response to the renewed outreach from CD&R on a merger, the Cornerstone Board appointed a special committee of Cornerstone directors on September 21, 2021 (the "Cornerstone Special Committee"). The Cornerstone Special Committee was comprised of Defendants Ball, Forbes and Holland, who had also been on the NCI Special Committee that was appointed by the CD&R-controlled NCI board. Another Cornerstone Special Committee member was Defendant Jackson, who had worked at GE for 15 years together with Defendants Krenicki, Janki and O'Brien. Messrs. Krenicki, Janki and O'Brien were now CD&R partners and executives and also served on Cornerstone's Board. Defendant Reinsdorf was the fifth member of the Cornerstone Special Committee and had joined the Cornerstone Board one month earlier.

62.   The Board resolution that created the Cornerstone Special Committee limited its authority. The Special Committee was authorized to "identify, review and evaluate alternatives" to a potential acquisition by CD&R, but had no authority to direct the Cornerstone Board to enter into any such alternative transaction.

63.   The Cornerstone Special Committee also did not have authority to decide whether the Standstill Provisions in the 2018 Stockholders Agreement should be waived. The Special Committee could only recommend "whether the Company should grant any waiver or

amendment to the [2018] Stockholders Agreement necessary to enable CD&R to make a proposal to the Board with respect to a Potential Transaction." As detailed below, the Special Committee did not discuss a waiver of the Standstill Provisions until February 2022 – long after CD&R had engaged in concrete negotiations to take Cornerstone private.

64.     The Cornerstone Special Committee met for the first time on a conference call later in the day on September 21, 2021. On the call, the Special Committee selected the law firm of Wachtell, Lipton, Rosen & Katz LLP ("Wachtell") as its legal advisor. Wachtell was retained after being invited to the Board meeting earlier that day by Defendant Metcalf.

65.     On September 24, 2021, CD&R told the Special Committee that CD&R "was not interested in selling or reducing its investment in the Company and would not vote to approve any alternative transaction that would result in any such sale or reduction." Given the limitations placed on the Special Committee's authority, CD&R's position effectively meant that the Special Committee could only consider an acquisition bid by CD&R. CD&R's stance also reinforced that it was only interested in an acquisition of the remaining Cornerstone shares it did not already own.

66.     The Special Committee next met on September 28, 2021, together with Wachtell and potential financial advisors on a CD&R acquisition. The Special Committee and management received presentations from representatives of Centerview Partners LLC ("Centerview"), Evercore, Inc., and Lazard Ltd as potential financial advisors.

67.     Wachtell also informed the Special Committee at this meeting that CD&R had retained the law firm of Kirkland & Ellis LLP ("Kirkland") as its legal counsel in connection with a potential transaction. Wachtell further reported to the Special Committee that "Kirkland had conveyed that CD&R view[ed] *itself as a potential acquirer* of shares of [Cornerstone] . . ."

### F.      Centerview is Selected as a Financial Advisor

68.      The Cornerstone Special Committee met the following day and on October 1, 2021 to discuss the selection of a financial advisor on a potential transaction with CD&R. Defendants Metcalf, Rose Lee, Brenner, and Jeffrey Lee attended these Special Committee meetings.   At the meeting on October 1, 2021, the Special Committee decided to retain Centerview as its financial advisor on a potential CD&R transaction.

69.      Centerview agreed to be paid on a contingent basis as the Special Committee's financial advisor.   Specifically, Centerview would be paid $5 million upon delivery of a fairness opinion and $15 million upon the completion of a transaction.

70.      The Special Committee met again on October 4, 2021 and authorized Cornerstone management to provide certain Company financial information to CD&R.   Wachtell representatives were also present at this meeting and reviewed certain provisions of the 2018 Stockholders Agreement with the Cornerstone Special Committee.   Wachtell informed the Special Committee that should it decide to pursue a potential transaction involving Cornerstone's publicly-held shares, it was required "to determine whether the Company should grant any waiver or amendment to the Stockholders Agreement to enable CD&R to make a proposal to the Board with respect to a Potential Transaction."   Given this review by its legal counsel, the Special Committee was indisputably aware of the restrictions placed on CD&R by the Standstill Provisions.

### G.      Defendants and CD&R Continue to Engage in Merger Negotiations in Violation of the Standstill Provisions

71.      The Cornerstone Special Committee met again on October 13, 2021.   At the meeting, the Special Committee agreed to provide CD&R with access to Cornerstone's monthly business results, and investor relations meetings with certain members of Cornerstone

management, as well as Defendants Janki and Ball. Cornerstone's upcoming earnings announcements were typically discussed at these investor relations meetings. The Proxy contains no reference to the October 13, 2021 Special Committee meeting, or the fact that CD&R was given access to this Company information as part of its due diligence process on a potential transaction.

72.     On October 25, 2021, the Special Committee met to review management's financial projections and Centerview's preliminary analysis. Centerview informed the Special Committee that Cornerstone's share price did not accurately reflect the Company's standalone value given CD&R's refusal to sell-down its significant equity stake in Cornerstone. As detailed further below, Cornerstone management also presented its standalone Discounted Cash Flow ("DCF") valuation of the Company using three separate sets of Company projections.

73.     On November 2, 2021, Centerview representatives and certain members of Cornerstone management held a teleconference with CD&R representatives. During the teleconference, Rose Lee, and Jeffrey Lee communicated "management's base case assumptions" to CD&R. The Proxy falsely stated that Centerview and Cornerstone management discussed the "upside case" financial projections with CD&R on this call when only the "base case" projections were discussed.

74.     The Special Committee met again on November 5, 2021 to discuss the teleconference with CD&R. The meeting minutes indicate that the Special Committee instructed Centerview to "communicate to CD&R the Special Committee's openness to hearing a ***proposal*** from CD&R" based on the information provided to date.

75.     On November 12, 2021, Defendants Sleeper and Zrebiec had a teleconference with Centerview representatives to discuss a potential transaction with CD&R. Messrs. Sleeper

and Zrebiec held executive positions at CD&R and both were CD&R designees to Cornerstone's Board at the time.  In describing the call, the Proxy stated that Messers. Sleeper and Zrebiec communicated that "CD&R would be prepared to consider exploring a potential transaction at an indicative valuation of $22.00 per share."

76.     The Special Committee met on November 15, 2021 to discuss the November 12 call.  The minutes from this meeting reflect that CD&R conveyed more than just a willingness to "explor[e] a potential transaction at an indicative valuation of $22.00 per share" as stated in the Proxy.  Rather, the November 15 Special Committee meeting minutes state that Defendants Sleeper and Zrebiec informed the Special Committee that CD&R was "prepared to consider exploring *an offer* to purchase the shares in the Company not owned by [CD&R} at a value of $22 per share[.]"  Such efforts by CD&R represented an "offer," "proposal," and "propos[al] to acquire" Cornerstone stock in breach of the Standstill Provisions of the 2018 Stockholders Agreement.  This breach was undisclosed to Cornerstone shareholders, yet was perpetuated by the transaction negotiations between CD&R and Cornerstone over the next several months.

77.     In furtherance of CD&R's efforts to acquire the outstanding publicly-held Cornerstone stock, the Special Committee agreed at this meeting to allow CD&R to engage Goldman Sachs & Co. and Royal Bank of Canada as possible sources of debt financing.  Defendants Sleeper and Zrebiec had proposed these banks for CD&R's deal financing, further demonstrating that CD&R was serious about an actual transaction.

78.     A day after the Special Committee meeting, Centerview representatives reached out to inform Messrs. Sleeper and Ball that the Special Committee wanted a higher valuation for Cornerstone stock.  On November 22, 2021, CD&R called Centerview and according to the Special Committee meeting minutes, "communicated that CD&R was now prepared to consider

20

exploring **an offer to purchase** the shares in the Company not owned by them at a value of $23 per share[.]"

79.     On November 23, 2021, the Special Committee met to discuss CD&R's $23.00 per share offer.  Centerview informed CD&R that "the $23 per share **offer** [was] insufficient to transact."

80.     CD&R continued its due diligence of Cornerstone throughout December 2021. On December 2, 2021, CD&R requested that Centerview help schedule calls with the heads of four different Cornerstone business units to address CD&R's questions.  The Special Committee approved CD&R's due diligence request at a meeting on December 3, 2021.

81.     The Special Committee next met on December 14, 2021 to receive a Centerview presentation on its updated financial analysis of CD&R's November 22 acquisition offer. Centerview's presentation referred to CD&R's November 22 offer as a "non-binding indication of interest[,]" an "offer" and a "proposal[.]"

82.     Representatives of CD&R held their requested due diligence conference call with members of Cornerstone management on December 16, 2021.  The Special Committee met on December 20, 2021 to discuss that call and receive additional financial analysis from Centerview.  During this meeting, the Special Committee approved additional due diligence requests by CD&R concerning Cornerstone's business.

83.     CD&R told Centerview on a December 22, 2021 call that it was "[p]repared to increase **their offer** . . . from $23.00 to $23.50 per share."  CD&R further told Centerview that CD&R wanted to transact now to "take advantage of favorable current debt financing conditions."

84.     The Special Committee met again on January 7, 2022 to review Centerview's analysis of CD&R's $23.50 per share acquisition proposal.  The Special Committee authorized Centerview to inform CD&R that its acquisition proposal was insufficient, but that it would likely recommend a transaction at $25 per share to the Board.

85.     On January 12, 2022, CD&R's counsel at Kirkland conveyed to Wachtell that CD&R expected it could provide an acquisition price that would be acceptable to the Special Committee.  In order to do so, Kirkland indicated that CD&R would need two or three weeks of additional due diligence and further engagement with additional sources of debt financing to fund the acquisition.

86.     The Special Committee met again on January 13, 2022 with representatives from Wachtell and Centerview to discuss the merger negotiations with CD&R and Kirkland.  The Special Committee approved CD&R's request for several more weeks to conduct its due diligence on an acquisition and to line up additional debt financing sources.

87.     From January 13, 2022 through February 6, 2022, CD&R continued to conduct due diligence on a potential transaction.  This included CD&R's access to a virtual data room that contained detailed information about Cornerstone.  CD&R also engaged with two additional sources of debt financing at this time.

88.     On February 7, 2022, CD&R communicated to Centerview its updated offer to acquire Cornerstone at $24.50 per share.  The Special Committee met again on February 9 and received a presentation from Centerview on CD&R's $24.50 per share proposal.  Centerview's presentation stated that CD&R had communicated it was "[p]repared to increase *the offer* to $24.50 per share for the shares not owned by [CD&R]," and that CD&R was "[p]repared to proceed expeditiously toward signing a definitive agreement."

89.     CD&R increased its offer to $24.65 per share of Cornerstone common stock on February 10, 2022.   CD&R described this indication of interest as its best and final, and reiterated that it would not sell its Cornerstone shares or approve an alternative transaction that would entail a dilution of its Cornerstone position.   It also stated that it would not permit a "go-shop" period after execution of a merger agreement to allow for consideration of potential topping bids by third parties.

### H.      The Special Committee Approves A Waiver of the Standstill Provisions

90.     On February 11, 2022, the Special Committee met with representatives of Centerview and Wachtell to review a Centerview presentation on CD&R's $24.65 offer price. According to the minutes from that meeting, the Special Committee "determined that it would be in the best interests of the Company and its unaffiliated stockholders to seek to accept a transaction with CD&R at a price of $24.65 per share."   The Special Committee also agreed to recommend to the full Cornerstone Board to grant a limited waiver of the Standstill Provisions in the 2018 Stockholders Agreement to allow CD&R to make a compliant proposal.   This was a mere formality given that CD&R had been negotiating with Cornerstone and its legal and financial advisors on an actual acquisition offer since at least September 2021.

91.     The Cornerstone Board approved a waiver of the Standstill Provisions on February 12, 2022.   The waiver was not approved until five months *after* CD&R expressed its initial interest in taking Cornerstone private, and after months of due diligence, financial analyses and projections from Centerview, and merger negotiations between CD&R, Cornerstone and the respective legal advisors at Kirkland and Wachtell in violation of the Standstill Provisions.   Thus, the belated waiver of the strict terms of the Standstill Provisions was done only after CD&R and Cornerstone had fully negotiated an acquisition at a price of $24.65 per share.

92.     On February 13, 2022, CD&R submitted a letter to the Special Committee proposing to acquire Cornerstone's outstanding publicly held stock for $24.65 per share and reiterated that it was its "best and final offer."  Consistent with its position throughout their negotiations, CD&R reiterated in its letter that it was "only interested in acquiring all of the Common Stock not already owned by the CD&R Funds, and we are not interested in pursuing any potential alternative transaction."  CD&R's letter also expressly recognized its obligation to file an amended Schedule 13D to reflect its acquisition offer.

93.     CD&R filed an amended Schedule 13D on February 14, 2022, which finally disclosed its intention to acquire Cornerstone and attached its February 13 offer letter to Cornerstone.  As detailed further below, the SEC sent Cornerstone two separate comment letters in May 2022 raising concerns with CD&R's belated Schedule 13D amendment given the clear cut merger negotiations that had been in process with Cornerstone for five months.  The Proxy misleadingly characterized these negotiations as mere "indication[s] of interest" and CD&R's concrete acquisition offers as "indicative valuation[s]" to mask the fact that CD&R had been in violation of the Standstill Provisions for months and had failed to timely amend its Schedule 13D to comply with clear Exchange Act requirements.

94.     On March 5, 2022, the Special Committee met together with its legal and financial advisors at Wachtell and Centerview.  The Special Committee unanimously voted to recommend the Merger to the Cornerstone Board.  The present Board members unanimously approved the transaction later that same day.  The Merger Agreement was executed on March 5, 2022 and the parties publicly announced it on March 7, 2022.

95.     The Company issued the definitive Proxy on May 24, 2022.  Cornerstone's stockholders voted to approve the Merger on June 24, 2022 and the transaction closed on July

25, 2022.  The shareholder vote was not fully informed because the Proxy contained material misstatements and omissions of material fact as detailed in Section V below.

## V.  THE MATERIAL MISSTATEMENTS AND OMISSIONS OF MATERIAL FACT IN THE PROXY

96.    The Proxy made material misstatements and omissions of material facts that deprived Cornerstone's stockholders of a fully informed vote on the Merger.

### A.    The Proxy Misstated CD&R's Offers to Acquire Cornerstone in Violation of the Standstill Provisions

97.    Defendants repeatedly misstated in the Proxy CD&R's offers to acquire Cornerstone which concealed the fact that CD&R's acquisition proposals were in clear violation of the Standstill Provisions in the 2018 Stockholders Agreement.  When the Proxy did refer to CD&R's interest in or efforts to acquire the remaining publicly held Cornerstone common stock, such statements were rendered materially false or misleading because they omitted that such actions violated the Standstill Provisions.

98.    Regarding CD&R's September 2021 initiation of a take-private transaction with Cornerstone, the Proxy stated that:

> [o]n September 16, 2021, Mr. Sleeper, acting in his capacity as a representative of CD&R, contacted Mr. Ball [a Cornerstone Board member] to inform Mr. Ball of CD&R's potential interest in determining the Board's receptivity to, and interest in, the possibility of exploring a potential transaction *in which CD&R would acquire* all of the outstanding shares of Company common stock not already owned by the CD&R Stockholders.

This statement was false and misleading because it concealed the material fact that CD&R's outreach on an acquisition of the outstanding shares of Cornerstone common stock was in violation of the Standstill Provisions.  It violated Section 3.3(a)(i) because it was an "indirect[]" "propos[al]" to acquire all of Cornerstone's outstanding shares.  CD&R's communication also violated Section 3.3(a)(ii) because it was a "statement" to a Board member that was later

conveyed to the full Board "regarding . . . a merger." CD&R's statement was not covered under the safe harbor for Section 3.3(a)(ii). This is because CD&R was required to file an amended Schedule 13D at this point since it had formulated an intention or plan to change its beneficial ownership of Cornerstone stock. The Proxy's omission of these material facts rendered the above statement about CD&R's acquisition outreach materially false and misleading.

99. The Proxy also misrepresented the actual scope of the Standstill Provisions in the 2018 Stockholders Agreement. In recounting the September 16 communication between Mr. Sleeper (as a CD&R representative) and Mr. Ball, the Proxy falsely described the prohibitions under the Standstill Provisions as follows:

> [Messrs. Sleeper and Ball] also discussed that, in light of the standstill restrictions under the Company's stockholders agreement, a limited waiver of the standstill restrictions would be required **before CD&R would be permitted to make a formal proposal**, . . . .

This statement falsely indicated that a waiver of the Standstill Provisions was only required in connection with a formal proposal by CD&R to acquire Cornerstone's outstanding common stock. But the Standstill Provisions had no such limitation. The plain language of the Standstill Provisions prohibited CD&R from making any formal or informal offer or proposal to acquire Cornerstone, and any statement or offer to the Board regarding a merger with Cornerstone whether formal or informal.

100. The Proxy further misrepresented that "CD&R would not make a formal proposal unless and until invited to do so by a special committee of independent directors." This statement was materially misleading because CD&R in fact engaged in concrete merger negotiations with Cornerstone over the course of the next several months. This included such formal steps as CD&R's extensive due diligence on Cornerstone, the retention of legal and financial advisors by both CD&R and Cornerstone, CD&R's engagement with debt financing

sources to fund an acquisition, and multiple price proposals by CD&R to acquire all of Cornerstone's outstanding common stock.

101.    In describing the Special Committee's meeting on November 5, 2021 to discuss a November 2 teleconference with Cornerstone management, Centerview and CD&R representatives, the Proxy stated that the Special Committee was merely "open to hearing an indication of value from CD&R."  This statement was materially misleading as it failed to disclose that the Special Committee was in fact receptive to an actual transaction proposal from CD&R.  The minutes from the Special Committee's November 5 meeting bear this out. According to the minutes, the Special Committee instructed Centerview to "communicate to CD&R the Special Committee's openness to hearing a *proposal* from CD&R" based on the information provided to date.  The Proxy's characterization concealed the fact that CD&R and Cornerstone and were actually in the process of transaction negotiations in violation of the Standstill Provisions.

102.    The Proxy similarly misstated CD&R's communication with Centerview on November 12, 2021 regarding a potential acquisition of Cornerstone.  The Proxy stated that during a teleconference on that date, Defendants Sleeper and Zrebiec communicated to Centerview representatives that "if invited by the Special Committee, CD&R would be prepared to consider exploring a potential transaction at an indicative valuation of $22.00 per share of Company common stock."  This once again mischaracterized that CD&R had in fact communicated its interest in an actual offer to acquire Cornerstone in violation of the Standstill Provisions.  Contrary to the statement in the Proxy, the minutes from the Special Committee's November 15, 2021 meeting state that Defendants Sleeper and Zrebiec indicated CD&R was

"prepared to consider exploring **an offer to purchase** the shares in the Company not owned by them at a value of $22 per share[.]"

103.    The Proxy also mischaracterized the fact that CD&R made an updated acquisition proposal on November 22, 2021 at an offer price of $23 per Cornerstone share.  In describing this CD&R offer, the Proxy stated that on November 22, CD&R merely told Centerview it "would be prepared to consider exploring a potential transaction at an indicative valuation of $23.00 per share."  But the minutes from the Special Committee meeting on November 23, 2021 reflect that this was an offer price from CD&R, not a mere "indicative valuation."  The minutes state that CD&R "communicated [to Centerview] that CD&R was now prepared to consider exploring **an offer to purchase** the shares in the Company not owned by them at a value of $23 per share[.]"

104.    Centerview also made a presentation at the November 23 Special Committee meeting that repeatedly acknowledged CD&R had made an actual offer to acquire Cornerstone. For example, Centerview specifically noted that CD&R was "[p]repared to increase **their offer** for the shares not owned by them from $22 to $23 per share."  The Centerview presentation made the following additional references to CD&R's offer or proposal to acquire Cornerstone:

- A slide stated: "The presentation materials included herein include an overview of [CD&R]'s **updated proposal** and Centerview's preliminary financial analysis";

- Section 1 of the same presentation included a "Review of [**CD&R's] Updated Proposal**."

- Page 11 of the same presentation, under the subheading "Implied Share Price," describes the $23 per share consideration as "COPY [i.e., **CD&R] Offer** on 11/22/21: $23.00."

- Page 17 of that presentation also provided Centerview's financial analyses using an "[a]ssume[d] **Offer Price** of $23.00 per share."

- Page 25 of the presentation, Centerview's Historical Return Trading and Value vs. Peers analysis, characterized the $23 per share consideration as "COPY *Offer: $23.00*."

Despite this clear acknowledgment by the Special Committee's financial advisor that CD&R was making an actual offer to acquire Cornerstone, the Proxy misleadingly described it as CD&R's "indicative valuation" of Cornerstone stock.

105.   Following the Special Committee's rejection of CD&R's $23 per share offer, CD&R continued conducting due diligence on Cornerstone in December 2021.  This included due diligence conference call between CD&R representatives and members of Cornerstone management on December 16, 2021.

106.   The Proxy states that on December 22, 2021, Messrs. Sleeper and Zrebiec, on behalf of CD&R, communicated to Centerview that "if invited by the Special Committee, CD&R would be prepared to consider exploring a potential transaction at an indicative valuation of $23.50 per share of Company common stock."  This statement materially misrepresented the state of merger negotiations between CD&R and Cornerstone.  Contrary to the equivocal description in the Proxy, CD&R had once again communicated an offer to acquire Cornerstone without a waiver of the Standstill Provisions.  In fact, CD&R told Centerview on a December 22 telephone call that it was "[p]repared to increase *their offer* for the shares not owned by them from $23.00 to $23.50 per share."

107.   The Special Committee met on January 7, 2022 to discuss CD&R's December 22 offer.  Following Centerview's presentation at this meeting, the Special Committee determined that CD&R's offer price of $23 per share was insufficient, but indicated that it would be receptive to an offer price closer to the $25 per share range.

108.   On January 12, 2022, CD&R's counsel at Kirkland told Wachtell that CD&R anticipated it could propose an acceptable acquisition price for the Special Committee, but would need two or three weeks to conduct additional Cornerstone due diligence and engage with debt financing sources.  The Proxy misleadingly stated that "[d]uring this conversation, the Kirkland [] representative reaffirmed that CD&R would not make a proposal unless invited to do so by the Special Committee and then only subject to an appropriate waiver of the standstill provisions of the stockholders agreement that would otherwise prohibit CD&R from making a proposal."  This statement was materially false and misleading because CD&R had been making concrete acquisition proposals in violation of the Standstill Provisions since at least September 16, 2021.

109.   Following its additional Cornerstone due diligence over the course of the next three weeks, CD&R made an updated acquisition proposal on February 7, 2022 of $24.50 per Cornerstone share.  The Proxy used the same misleading formulation in describing CD&R's revised February 7 offer.  Specifically, the Proxy stated that Messrs. Sleeper and Zrebiec told Centerview's representatives that "if invited by the Special Committee, CD&R would be prepared to consider exploring a potential transaction at an indicative valuation of $24.50 per share."  This once again misstated the fact that CD&R had made an actual offer to acquire Cornerstone at a price of $24.50 per share in violation of the Standstill Provisions.

110.   In fact, Centerview's February 9 presentation to the Special Committee stated that CD&R had communicated it was "[p]repared to increase *the offer* to $24.50 per share for the shares not owned by [CD&R]," and that CD&R was "[p]repared to proceed expeditiously toward signing a definitive agreement."  Centerview's presentation further stated that CD&R's offer of $24.50 represented an increase in CD&R's "offer[s]" on November 12, November 22, and December 22.

111.    Following multiple conversations between representatives of CD&R and Centerview, CD&R increased its offer price to $24.65 per Cornerstone share on February 10, 2022.  The Proxy once again concealed that this represented an actual offer by CD&R that violated the Standstill Provisions.  Rather than acknowledge this, the Proxy repeated that "if invited by the Special Committee, CD&R would be prepared to consider exploring a potential transaction at a best and final indicative valuation of $24.65 per share."  This was CD&R's best and final offer price, not an "indicative valuation" as described to stockholders.

112.    As noted above, the Cornerstone Board did not approve a waiver of the Standstill Provisions in the 2018 Stockholders Agreement until February 12, 2022.  CD&R sent a proposal letter to Cornerstone on February 13, 2022 at the $24.65 acquisition price.  On February 14, 2022, CD&R finally amended its Schedule 13D filing with the SEC to reflect its proposal to acquire Cornerstone.  The SEC criticized CD&R's failure to amend its Schedule 13D earlier given CD&R's clear intent to increase its beneficial ownership of Cornerstone stock over the prior five to six months.  The SEC's letters to CD&R plainly support the conclusion that CD&R made actual offers to acquire Cornerstone and demonstrate the falsity of the Proxy's statements in this regard.

113.    On May 2, 2022, the SEC sent CD&R's counsel at Wachtell a letter in response to the Preliminary Proxy and Schedule 13e-3 transaction statement Cornerstone filed on April 7, 2022 in connection with the Merger.  The SEC's letter questioned why CD&R had not amended its Schedule 14D to reflect that CD&R's acquisition proposals as follows:

> We note the disclosure in the Background of the Merger section referring to various events of interaction between the CD&R entities and the company and that none of those events resulted in the filing of an amendment to the Schedule 13D filed by any of the CD&R entities.  Please advise us why the CD&R entities did not file an amendment to report a change in their plans for the company shares in "the summer of 2019," on September 16, 2021, on November 12 and 22, 2021

(the earlier instance coupled with an indication that CD&R was interested in contacting financing sources) and continuing until February 14, 2022 in connection with its expressions of interest in and negotiations for an acquisition of the company's shares not already owned by CD&R.

The SEC clearly recognized that CD&R had made concrete proposals to acquire Cornerstone contrary to the above statements in the Proxy, which warranted an amendment to CD&R's Schedule 13D.

114.    The SEC reiterated this in its letter on May 20, 2022 to Wachtell. The SEC disputed Cornerstone's assertion that CD&R had complied with its obligations under Schedule 13D by noting CD&R's definitive actions in furtherance of a Cornerstone acquisition. As detailed in the SEC's letter, this included the fact that:

- in 'the summer of 2019' CD&R communicated to 'George L. Ball, an independent director who had served as chairman of the special committee . . ., CD&R's potential interest in exploring a transaction in which CD&R would acquire all of the outstanding shares of Company common stock not then owned by the CD&R Stockholders.';

- on September 16, 2021, CD&R again expressed its interest in a similar transaction;

- between September and November 2021, the company's board of directors and management took various actions in response to CD&R's communications, including establishing a special committee, and allowing Cornerstone management to provide a briefing to CD&R relating to the company's financial update and operating, financial and strategic plans and sharing two sets of projections;

- on November 12 and 22, 2021, CD&R provided and increased, respectively, a quantified indicative value to Cornerstone;

- on November 12, 2021, CD&R asked for (and, on November 15, 2021 received) permission from Cornerstone to contact financial sources for the transaction; and

- until February 14, 2022, CD&R and Cornerstone took several more actions that, together with the events referenced above, indicated that CD&R had materially changed its position with respect to its investment in Cornerstone."

The SEC plainly viewed these actions to be concrete enough to warrant an amendment to CD&R's Schedule 13D.  The SEC's correspondence further establish that the Proxy's generic description of CD&R's "indicative valuation[s]" were materially false and misleading.

**B.      The Proxy Misstated Cornerstone's Financial Projections By Omitting That They Were Revised Downward at CD&R's Direction**

115.    During the course of merger negotiations between Cornerstone and CD&R, Cornerstone management presented the Special Committee and Centerview with a series of financial projections for the Company.  Management prepared these financial projections to assist the Special Committee and Centerview in their evaluation of a potential transaction with CD&R.

116.    Cornerstone management presented the Special Committee with five-year (*i.e.*, fiscal years 2022 through 2026) financial projections at the Special Committee's October 25, 2021 meeting (the "October 25 Projections").  The projections included (i) "base case," (ii) "downside case" and (iii) "upside case" scenarios for the Company, which measured financial metrics such as revenue, unlevered free cash flow, and adjusted earnings before interest, taxes, depreciation, and amortization ("Adjusted EBITDA").

117.    Centerview was provided with these Company projections on October 21, 2021 and prepared presentation materials based on the projections for the October 25 Special Committee meeting.  As noted above, Cornerstone's business was organized into the following three operating segments: (i) Windows Segment, (ii) Siding Segment, and the (iii) Commercial Segment.  Centerview's October 25 presentation stated a "5-6% growth" in the Company's Windows Segment for fiscal years 2023 through 2026 using Cornerstone's "base case" financial projections.  With respect to Cornerstone's Commercial Segment, Centerview's presentation

stated that it would experience "[r]ecovery in '21E-'22E" and "3% growth by '26E" using Cornerstone's "base case" projections.

118.    Centerview also presented its initial discounted cash flow ("DCF") analysis based on management's three financial projection scenarios.   The "base case" DCF resulted in an implied share price range of $24-$39 per Cornerstone share.  Centerview's "upside case" DCF resulted in an implied share price range of $42-$64 per Cornerstone share.  Using the "base case" financial projections, Centerview's midpoint value was $31 per Cornerstone share.   At its October 25 meeting, the Special Committee authorized Centerview and Company management to share this information with CD&R, including the "base case" and "upside case" projections prepared by Cornerstone management.

119.    On November 2, 2021, certain Centerview representatives, Cornerstone CEO Rose Lee, and Cornerstone CFO Jeffrey Lee conveyed the Company's "base case" financial projections to CD&R via teleconference.   In describing the November 2 teleconference, the Proxy falsely stated that CD&R was provided with the "preliminary base case and upside case projections."  Yet, the minutes from the November 5, 2021 Special Committee meeting indicate that the "upside case" projections were not shared with CD&R on the call.

120.    Cornerstone management provided Centerview with revised Company financial projections on November 3, 2021 (the "November 3 Projections").  The November 3 Projections were substantially similar to the October 25 Projections and still included "base case," "upside case," and "downside case" projections for Cornerstone.   The primary difference in the November 3 Projections was an adjustment to the Company's cash on hand to reflect $53 million in settlement proceeds from litigation arising out of the 2018 NCI/Ply Gem Merger.

121.    The Special Committee met on November 23, 2021 to discuss CD&R's November 22 offer to acquire Cornerstone at $23.00 per share.  At this meeting, Centerview presented another DCF analysis to the Special Committee based on the November 3 Projections.  Centerview's DCF valuations increased as a result of the $53 million settlement payment reflected in the November 3 Projections.  The DCF range for the "base case" increased by over $3 per share to $27.50-$42.25 per Cornerstone share (from $24-$39 under the October 25 Projections), and by $2 per share for the "upside case" to $44.00-$65.75 per Cornerstone share (from $42-$64 under the October 25 Projections).  These share price ranges were clearly higher than the $23.00 per share offered by CD&R on November 22, 2021.

122.    Centerview's presentation on the November 3 Projections also stated a consistent five year increase in net sales and gross profits in Cornerstone's Windows and Commercial Segments.  Specifically, Centerview's presentation showed an increase in net sales in the Windows Segment from $2.4 billion in 2021 to $3.4 billion in 2026, reflecting a Compound Annual Growth Rate ("CAGR") of 7% from 2021 to 2026.  The presentation similarly reflected increased net sales in the Commercial Segment from $1.5 billion in 2021 to $2.37 billion in 2026, reflecting a CAGR of 8% during this period.  With respect to the gross profits in Cornerstone's Windows Segment, Centerview's presentation reflected an increase from $479 million in 2021 to $878 million in 2026, representing a CAGR of 13% from 2021 to 2026.  The November 3 Projections also showed a gross profit increase in Cornerstone's Commercial Segment from $371 million in 2021 to $579 million in 2026, representing a CAGR of 9% during this period.  In addition, the November 3 Projections showed an increase in the Adjusted EBITDA for the Windows Segment from $295 million in 2021 to $589 million in 2026, representing a 15% CAGR.  The Projections similarly reflected an increase in the Adjusted

EBITDA for the Commercial Segment from $234 in 2021 to $376 in 2026, representing a 10% CAGR.

123.    At the November 23 meeting, the Special Committee purportedly instructed Cornerstone management to create a single operating case for the Company's financial projections, rather than the "base case," "upside case," and "downside case" they had been using. As noted above, the Special Committee also instructed Centerview to tell CD&R that its November 22 offer to acquire Cornerstone for $23.00 per share was inadequate. This message to CD&R was presumably based on Centerview's DCF analyses derived from the October 25 and November 3 Projections.

124.    On December 3, 2021, Cornerstone management presented the requested single operating case projections to the Special Committee and shared it with Centerview (the "December 3 Projections"). Like the prior projections, the December 3 Projections reflected growth in Cornerstone's Windows and Commercial Segments over the next five years. Specifically, Centerview's presentation showed an increase in net sales in the Windows Segment from $2.4 billion in 2021 to $3.1 billion in 2026, representing a CAGR of 5% during this period. The December 3 Projections also reflected an increase in net sales in the Commercial Segment from $1.58 billion in 2021 to 2.0 billion in 2026, representing a 6% CAGR. The projections also indicated an increase in gross profits for Cornerstone's Windows Segment from $479 million in 2021 to $795 million in 2026, representing an 11% CAGR. The gross profits from Cornerstone's Commercial Segment were also projected to increase from $371 million in 2021 to $510 million in 2026, a 7% GAGR during this period. The Adjusted EBITDA in the Windows Segment increased from $295 million in 2021 to $519 million in 2026, representing a 9% CAGR. The December 3 Projections also reflected an increase in the Adjusted EBITDA

36

from the Commercial Segment of $234 million in 2021 to $313 million in 2026, a 6% CAGR during this period.

125.    Notwithstanding this Segment growth, the December 3 Projections assumed an overall 6% residential market decline in 2024 and a 6% commercial market decline in 2025.  The December 3 Projections eliminated a total of $1.8 billion of net sales and a total of $280 million of free cash flow for 2024 through 2026.

126.    Thus, Cornerstone management assumed a significant market recession in 2024 and 2025 that was not present in the Company's prior "base case" and "upside case" projections. This served to undercut Centerview's DCF analysis of Cornerstone's implied share price. Centerview's revised DCF based on the December 3 Projections resulted in a valuation range of $22-$34 per Cornerstone share.  This represented a downward revision from Centerview's range of $27.50-$42.25 per share under the "base case" in the November 3 Projections. Notwithstanding the reduced share price range resulting from the December 3 Projections, CD&R sought a further downward revision from Cornerstone management to justify its offer price for the Company.

127.    Upon information and belief, the December 3 Projections were shared with CD&R on a December 16, 2021 conference call with members of Cornerstone's management and its business unit leaders.  During a call with Centerview on December 22, 2021, CD&R stated that it was prepared to increase its acquisition offer for Cornerstone from $23.00 to $23.50 per share.  However, CD&R expressed concern about Cornerstone's projections regarding the Windows and Commercial Segments, thereby signaling that it wanted additional downward revisions in those segments.  As stated in Centerview's January 7, 2022 presentation to the Special Committee:

- [CD&R] [e]xpressed concerns around specific assumptions in the projections shared by [Cornerstone] Management:

- Windows volume – projected vs. historical trends, expected impact from new Home Depot business

- Materials pricing-cost spread – projected vs. historical trends for Commercial segment

128.     Centerview informed Cornerstone's CFO, Jeffrey Lee, about CD&R's stated concerns regarding the Windows and Commercial Segments.  On December 28, 2021, Mr. Lee emailed Adam Beshara at Centerview to specifically address the Windows and Commercial Segments identified by CD&R.  Mr. Lee's email noted "potential risks" that cut $49 million from the Commercial Segment and $9 million from the Windows Segment as follows:

> **To:** Adam Beshara[abeshara@centerview.com]
> **Cc:** Jack Sise[jsise@centerview.com]; Andrew Woeber[awoeber@centerview.com]; Ramon Zepeda[rzepeda@centerview.com]; Rose Lee[Rose.Lee@cornerstone-bb.com]; Alena S. Brennan[Alena.Brennan@Cornerstone-BB.com]
> **From:** Jeff Lee[/O=EXCHANGELABS/OU=EXCHANGE ADMINISTRATIVE GROUP (FYDIBOHF23SPDLT)/CN=RECIPIENTS/CN=438F18AF431E46FAA49F4A69FCDB5708-JEFF LEE]
> **Sent:** Tue 12/28/2021 3:54:31 PM Coordinated Universal Time
> **Subject:** RE: Metals & HD volume
> **Attachment:** Overall Risk to $77M EBITDA Plan based on current events.pptx
> **Attachment:** Buildings Components Spread Analysis V3.xlsx
> **Attachment:** USWG Consolidated Manufacturing KPI Dashboards 2022 Budget.xlsx
>
> Adam, we are still working the Home Depot Analysis, but I wanted to pass along the potential risk to the 2022 plan with the following assumptions:
>
> Commercial overall risk to plan of $49M
> 1. Buildings spread / Ton (Price less material) plan of $1,918 / Ton reverts back to $1,478 by year end (Backlog support Q1)
> 2. Components spread plan of $920 / Ton reverts back to $875 by year end
>
> Windows overall risk to plan of $9M
> 1. MFG efficiencies has a glide path to plan minutes per opening vs. the plan which has a immediate step up minutes per opening starting in Q1.
>    A. Potential additional labor costs in Q1
>    B. Potential risk to volume of 4% in Q1

Because the "risks" identified by Mr. Lee were to each year of the five-year December 3 Projections, the cumulative impact was to eliminate $253 million of total EBITDA from Cornerstone's Commercial Segment and $45 million of total EBITDA from the Windows Segment.

129.     The December 3 Projections were then revised by Jeffrey Lee (CFO) and Rose Lee (CEO) to reflect the downward revisions advocated by CD&R.  These revised projections were provided to the Special Committee on January 3, 2022 (the "January 3 Projections").  On

January 3, Mr. Lee also emailed Centerview to explain that the December 3 Projections would need to be reduced further given purported issues in the Windows and Commercial Segments. These were the only two segments of Cornerstone's business that were revised downward, and were the exact two operating segments identified by CD&R only two weeks earlier:

**To:** Jack Sise[jsise@centerview.com]; Ramon Zepeda[rzepeda@centerview.com]; Adam Beshara[abeshara@centerview.com]; Andrew Woeber[awoeber@centerview.com]
**Cc:** Rose Lee[Rose.Lee@cornerstone-bb.com]; Alena S. Brenner[Alena.Brenner@Cornerstone-BB.com]
**From:** Jeff Lee[/O=EXCHANGELABS/OU=EXCHANGE ADMINISTRATIVE GROUP (FYDIBOHF23SPDLT)/CN=RECIPIENTS/CN=438F18AF431E46FAA49F4A69FCDB5708-JEFF LEE]
**Sent:** Mon 1/3/2022 8:27:50 PM Coordinated Universal Time
**Subject:** Project Return - Updated forecast
**Attachment:** Base with Recession Model 11-30-21 - Consensus Forecast updated 1-3-21 for recent information and Q4 performance.xlsm

Centerview team,
Please see attached updated 5 year model for your review and comments. Over the past few weeks we have been updating our plan assumptions; in particular our views on 2022 as we conclude the 2021 year. As you are aware our industry operates in a dynamic everchanging environment. After further business reviews with our business unit presidents and finance leads, both Rose and I feel our forecast for 2022, and impact on subsequent years, needs to be revised to best reflect our current thinking based on the new operating environment. Over the past few months we have experienced a deterioration within our windows segment with regards to manufacturing inefficiencies and pricing delays. Our commercial segment has been able to get price over inflation and continues to perform with slightly lower than anticipated volume. However, overall bookings for our business, but more pronounced within our commercial business, have pulled back. Our Commercial Segment has seen a faster than anticipated change in steel costs assumptions which we believe will add pressure to maintain the projected spread per ton in 2022.
Taking the new information into consideration we have lowered our revenue and EBITDA projections for 2022 by $50M; taking the pre-acquisition EBITDA from $775M to $725M for the year.
Thanks,

130.    The downward revisions in the January 3 Projections contradicted the actual performance of Cornerstone's Windows and Commercial Segments.  The revisions were at odds with the consistent growth in the Windows and Commercial Segments, including increased sales gross profits, and Adjusted EBITDA stated in the October 25, November 3, and December 3 Projections.  Moreover, Cornerstone's August 2021 net sales were 34.5% higher year-over-year, attributable to positive prices across all segments and higher volumes in the Windows Segment. Adjusted EBITDA was 15% higher year-over-year because of a favorable spread in the Commercial Segment.

131.    The downward revisions to the January 3 Projections impacted Centerview's DCF analysis of Cornerstone's implied share price.   Centerview's DCF under the January 3 Projections resulted in an implied share price range of $19.50-$30.75 per Cornerstone share.

This represented a decrease in the implied share price of $22-$34 per Cornerstone share under Centerview's December 3 Projections DCF.

132.   The Proxy materially misstated the basis for the January 3 Projections and reason why they were revised downward.  The Proxy falsely stated that:

> [m]embers of senior management explained that they had prepared a revised plan for fiscal year 2022 after considering, in their best judgment, the probable impact of the current market environment on Cornerstone's business, with particular focus on the ability of Cornerstone to achieve operational improvements in its windows business unit and the likelihood of maintaining favorable steel pricing.

A later section of the Proxy similarly misstated the origin of the downwardly revised January 3 Projections:

> In early January 2022, the Company's management subsequently updated the December 3 Projections to reflect a downward revision to management's forecast for fiscal year 2022 after considering, in their best judgment, the probable impact of the current market environment on the Company's business, with particular focus on the ability of Cornerstone to achieve operational improvements in one of its significant business lines, and the likelihood of maintaining favorable steel pricing (the "January 3 Projections").

133.   These statements were materially false and misleading because they concealed that the January 3 Projections were created in response to CD&R's critique of the December 3 Projections.  As is now evident from Cornerstone's internal documents, Jeffrey Lee revised the December 3 Projections downward in the Windows and Commercial Segments, which were precisely the same operating segments identified by CD&R for downward revision.  Such revisions were contrary to the consistent estimated growth in the Windows and Commercial Segments found in the Company's projections only a month or two earlier (*i.e.*, the November 3 and December 3 Projections).  The Proxy gave the false impression to Cornerstone shareholders that the downward revisions in the January 3 Projections were based on management's forecasts concerning the Windows and Commercial Segments, when in fact, they reflected CD&R's

desired revisions – and helped to justify a lower per share acquisition price for Cornerstone's public shares.

### C.     The Proxy Misstated Cornerstone's Valuation By Failing to Account for the Coil Coaters Transaction

134.    During the course of negotiations with CD&R on its acquisition of Cornerstone, Company management was engaged in a parallel sales process for the divestment of Cornerstone's lucrative metal coil coatings business ("Coil Coatings").  Cornerstone ultimately sold Coil Coaters in April 2022 for $500 million (the "Coil Coatings Transaction"), yet the Company's projections were not updated to reflect the sale proceeds.  Nor did Centerview's DCF valuations reflect the expected future cash flow from the anticipated Coil Coatings sale.

135.    At the time the Proxy for the CD&R Merger was issued on May 24, 2022, Cornerstone management had already been considering a sale of the Company's Coil Coatings business for several years.  Cornerstone's Coil Coatings business was a material Company asset.  The business's 2021 net sales were approximately $214 million, constituting 11.3% and 3.8% of reported net sales for Cornerstone's Commercial Segment and overall business, respectively.  In 2021, the Company identified Coil Coatings as a significant asset sale and had engaged legal and financial advisors in connection with an anticipated sale for 2022.  These concrete divestment plans for Cornerstone's Coil Coatings business occurred concurrently with Defendants' merger negotiations with CD&R throughout 2021.

136.    For example, Cornerstone's management informed the Board during its meetings on June 28 and August 19, 2021 that discussions on the sale of the Coil Coatings business were "[o]ngoing" and that Cornerstone received "[c]ontniue[d] interest" "from various parties."

137.    This message was reiterated at a meeting of the Special Committee on September 28, 2021.  The Special Committee was informed during this meeting that Cornerstone

management was engaged in ongoing divestment discussions regarding Coil Coatings.  This included transaction discussions with BlueScope Steel Limited ("BlueScope") since January 2020.  BlueScope had expressed interest in acquiring the Coil Coatings business for three years and became the ultimate buyer in April 2022.  The Special Committee was further informed that management had engaged in due diligence on the Coil Coatings divestment, including the preparation of a management presentation in furtherance of a possible sale.  Cornerstone's management also told the Special Committee it was receiving "advice on strategy, negotiations and next steps" concerning a Coil Coatings divestment.

138.    The Special Committee's financial advisor on the CD&R merger, Centerview, also recognized that a divestment of the Coil Coaters business would provide meaningful value for Cornerstone.  In its October 25, 2021 presentation to the Special Committee concerning a possible transaction with CD&R, Centerview identified "*Potential areas of focus: Coil Coaters*" as a divestment opportunity given that it "had a record month in September '21." Centerview's presentation further stated that divestitures such as Coil Coatings could "[r]educe[] the burden on the company's growth / profitability profile and Management's focus," and that the "[p]roceeds can continue to help delever towards the Company's leverage ratio."

139.    Cornerstone's management later informed the Board at its December 2, 2021 meeting, that the **"[t]iming is right for pursuing the divestiture of [Coil Coatings]"** because of favorable earnings in the business.  Management also advised the Board about the benefits of a Coil Coatings divestment to Cornerstone's balance sheet:

> **Further portfolio re-orientation could be a key catalyst to unlocking value**[;] Removes perceived lower multiple business from portfolio and can streamline the equity story[;] Proceeds could reduce leverage and be used for organic/inorganic growth in core businesses[.]

140.     Cornerstone's Management had also taken concrete steps towards executing a divestment of the Coil Coatings business at this time.  The Cornerstone Board was informed at its December 2, 2021 meeting that Cornerstone management had already retained Sullivan & Cromwell LLP as its legal advisor on a Coil Coatings sale, Rothschild & Co. as its M&A advisor, and Alvarez & Marsal Transaction Advisory Group, LLC for accounting advisory work on a transaction.  Cornerstone management also identified BlueScope as a possible counterparty for a pre-sale process to begin in the first quarter of 2022.

141.     In January 2022, Cornerstone and BlueScope engaged on this pre-sale process for the Coil Coatings business.  BlueScope made significant efforts to acquire Coil Coatings over the next several months.  BlueScope sought to pre-empt the sale process, and by March 2022 had nearly completed its diligence on the Coil Coatings business.  Cornerstone concluded that other offers would be lower and that BlueScope was the most logical buyer.

142.     Given the advanced nature of the divestment negotiations with BlueScope, both Cornerstone management and the Cornerstone's Board necessarily anticipated a sale of Coil Coatings when Centerview issued its fairness opinion on the CD&R Merger on March 5, 2022.  Despite this, Defendants never updated Cornerstone's projections (nor Centerview its DCF analysis) to account for Coil Coatings' $500 million valuation.

143.     Defendants omitted from the Proxy material information about the Company's plan to sell Coil Coatings for $500 million.  The Proxy misleadingly described the Coil Coatings transaction under the "Recent Developments" section when, in fact, it had been in process since at least 2021.  Contrary to the description in the Proxy, Defendants knew that (i) BlueScope wanted to buy Coil Coatings for at least three years, (ii) Cornerstone had been engaged in Coil Coatings transaction discussions with BlueScope since at least January 2020, and (iii) as of

December 2, 2021, Cornerstone management was prepared to sell the business and had identified

parties, including BlueScope, to negotiate with on a transaction.  BlueScope had also worked to

preempt a sale process in the first quarter of 2022 and sought to close the acquisition of Coil

Coatings in the second quarter of 2022.  The Proxy omitted any detail on the divestment process

for Coil Coatings that occurred concurrently with the CD&R Merger negotiations, and

Defendants' failure to include the expected $500 million sale of Coil Coatings in Cornerstone's

valuation.

## VI.   LOSS CAUSATION

144.   As described herein, Cornerstone, the Board Defendants, and the Officer

Defendants made materially false and misleading statements and omissions of material fact in

the Proxy.  Their materially false and misleading statements and omissions as set forth above

caused Plaintiff and members of the Class to accept Merger Consideration that failed to

adequately value Cornerstone's common stock.  As a result of their ownership of Cornerstone

common stock, Plaintiff and other Class members suffered damages.

## VII.   INAPPLICABILITY OF STATUTORY SAFE HARBOR

145.   The statutory safe harbor provided for forward-looking statements under certain

circumstances does not apply to any of the false statements alleged in this Complaint.  The

statements alleged to be false and misleading herein all relate to then-existing facts and

conditions.  In addition, to the extent certain of the statements alleged to be false may be

characterized as forward-looking, there were no meaningful cautionary statements identifying

important factors that could cause actual results to differ materially from those in the purportedly

forward-looking statements.  Further, to the extent that the statutory safe harbor is determined to

apply to any forward-looking statements pleaded herein, Defendants are liable for those false

forward-looking statements because at the time each of those forward-looking statements were made, the speaker had actual knowledge that the forward-looking statement was materially false or misleading, and/or the forward-looking statement was authorized or approved by an executive officer of the Company who knew that the statement was false when made.

## VIII.   <u>CLASS ACTION ALLEGATIONS</u>

146.   Plaintiff brings this Action on its own behalf and as a class action, pursuant to Rule 23 of the Federal Rules of Civil Procedure, on behalf of all former holders of Cornerstone common stock as of the Record Date through the closing of the Merger (the "Class").  Excluded from the Class are Defendants and any person, firm, trust, corporation, or other entity related to, or affiliated with, any of the Defendants.

147.   This Action is properly maintainable as a class action.

148.   The Class is so numerous that joinder of all members is impracticable. According to the Proxy, as of May 16, 2022, members of the Class held more than 63 million shares of outstanding Cornerstone common stock. Upon information and belief, there are hundreds or thousands of members of the Class.

149.   There are questions of law and fact that are common to the Class, including, among others:

A.   Whether Cornerstone, the Board Defendants and the Officer Defendants violated Section 14(a) of the Exchange Act and Rule 14a-9 promulgated thereunder;

B.   Whether the Board and Officer Defendants violated Section 20(a) of the Exchange Act; and

C.   Whether Plaintiff and the other members of the Class are entitled to equitable relief or damages as a result of Defendants' misconduct.

150.   Plaintiff's claims are typical of those of the Class because Plaintiff and the Class have been damaged by Defendants' wrongful conduct.

151.   Plaintiff will adequately protect the interests of the Class and have retained counsel experienced in class action securities litigation.  Plaintiff has no interests that conflict with those of the Class.  All members of the Class have suffered the same harm.

152.   The prosecution of separate actions by individual members of the Class would create the risk of inconsistent or varying adjudications for individual members of the Class and of establishing incompatible standards of conduct for the parties opposing the Class.  Conflicting adjudications for individual members of the Class might be dispositive of the interests of the other members not parties to the adjudications, or substantially impair or impede their ability to protect their interests.  Therefore, a class action is superior to other available methods for the fair and efficient adjudication of this controversy.

153.   The questions of law and fact common to the members of the Class predominate over any questions affecting only its individual members, such that a class action is superior to any other available method for fairly and efficiently adjudicating the controversy.

## COUNT I

**Against Cornerstone, the Board Defendants and Officer Defendants for Violations of Section 14(a) of the Exchange Act and Rule 14a-9 Promulgated Thereunder**

154.   Plaintiff incorporates each and every allegation set forth above as if fully set forth herein.

155.   Cornerstone, the Board Defendants, and the Officer Defendants disseminated a false and misleading Proxy containing statements that, in violation of Section 14(a) of the Exchange Act and Rule 14a-9, and in light of the circumstances under which they were made,

misrepresented or omitted material facts necessary to make the statements therein not materially false or misleading.

156.    The Proxy was prepared, reviewed, and/or disseminated by Cornerstone, the Board Defendants, and the Officer Defendants.   Each of the Defendants authorized the dissemination of the Proxy, the use of their names in the Proxy, and were involved in the sales process leading up the signing of the Merger Agreement.   By virtue of their positions within Cornerstone, these Defendants were aware of the misstated and omitted information alleged herein and their duty to make accurate statements and disclose all material information in the Proxy.

157.    Cornerstone, the Board Defendants, and the Officer Defendants were at least negligent in issuing a false and misleading Proxy.   Plaintiff, while reserving all rights, expressly disclaims and disavows at this time any allegation in this Complaint that could be construed as alleging fraud against Cornerstone, the Board Defendants and the Officer Defendants in connection with this Count.   This claim sounds in negligence based on the failure of Defendants to exercise reasonable care to ensure the Proxy did not contain the material misstatements and omissions alleged herein.

158.    The omissions and false and misleading statements in the Proxy are material in that a reasonable shareholder would have considered them important in deciding how to vote on the Merger.   In addition, a reasonable investor would view a full and accurate disclosure as significantly altering the total mix of information made available in the Proxy and in other information reasonably available to Cornerstone shareholders.

159.    The Proxy was an essential link in causing Cornerstone shareholders to approve the Merger.

160.    By reason of the foregoing, Cornerstone, the Board Defendants, and the Officer Defendants violated Section 14(a) of the Exchange Act and Rule 14a-9 promulgated thereunder.

161.    Because of the false and misleading statements in the Proxy, Plaintiff and the Class were harmed by an uninformed shareholder vote approving the Merger.

162.    This claim is brought within the applicable statute of limitations.

## COUNT II

**Against the Board Defendants and Officer Defendants for Violations of
Section 20(a) of the Exchange Act**

163.    Plaintiff incorporates each and every allegation set forth above as if fully set forth herein.

164.    Cornerstone, the Board Defendants, and the Officer Defendants disseminated a false and misleading Proxy in violation of Section 14(a) of the Exchange Act and Rule 14a-9, promulgated thereunder.

165.    The Board Defendants and Officer Defendants acted as controlling persons of Cornerstone and culpably participated in the Proxy violations within the meaning of Section 20(a) of the Exchange Act as alleged herein.  In particular, each of the Board Defendants and Officer Defendants had direct and supervisory involvement in the day-to-day operations of Cornerstone, and, therefore, had the power to control or influence the particular transaction giving rise to the Exchange Act violations alleged herein, and exercised the same.  The Board Defendants and Officer Defendants were involved in negotiating, reviewing, and approving the Merger Agreement.  The Proxy purports to describe the various issues and information that the Board Defendants and Officer Defendants reviewed and considered before recommending the Merger to the Class.

166.    The Board Defendants and Officer Defendants were provided with or had unlimited access to copies of the Proxy and other statements alleged by Plaintiff to be misleading prior to and/or shortly after these statements were issued, and had the ability to prevent the issuance of the statements or cause the statements to be corrected.  The Proxy expressly stated that it was issued "By Order of the Board of Directors," and was signed by Defendant Lee in her position as President and CEO of Cornerstone and Defendant Brenner as Executive Vice President and General Counsel of Cornerstone.

167.    The Board Defendants and Officer Defendants had the ability to exercise control over and did control a person(s) who has violated Section 14(a) of the Exchange Act and Rule 14a-9, by their acts and omissions as alleged herein.  By virtue of their positions as controlling persons, the Board Defendants and Officer Defendants are liable pursuant to Section 20(a) of the Exchange Act.  As a direct and proximate result of the conduct of the Board Defendants and Officer Defendants, Plaintiff and the Class were harmed by an uninformed shareholder vote approving the Merger.

168.    By virtue of the foregoing, the Board Defendants and Officer Defendants have violated Section 20(a) of the Exchange Act.

169.    This claim is brought within the applicable statute of limitations.

## IX.    <u>PRAYER OF RELIEF</u>

WHEREFORE, Plaintiff prays for judgment and relief as follows:

A.    Determining that this Action is a proper class action under Rule 23 of the Federal Rules of Civil Procedure;

B.      Declaring that Cornerstone, the Board Defendants and the Officer Defendants violated Sections 14(a) and 20(a) of the Exchange Act, as well as Rule 14a-9 promulgated thereunder;

C.      Awarding damages in favor of Plaintiff and the Class against all Defendants, jointly and severally, for all damages sustained as a result of Defendants' wrongdoing, in an amount to be proven at trial, including prejudgment interest thereon;

D.      Awarding restitution and equitable relief to Plaintiff and the Class;

E.      Directing Defendants to account to Plaintiff and the Class for all damages suffered as a result of their wrongdoing;

F.      Awarding Plaintiff pre- and post-judgement interest and the costs of this Action, including reasonable allowance for Plaintiff's attorneys' and experts' fees; and

G.      Granting such other and further relief as this Court may deem just and proper.

## X.    <u>JURY DEMAND</u>

Plaintiff respectfully requests a trial by jury on all issues so triable.

Date:  June 27, 2023           FARNAN LLP

<u>/s/ Brian E. Farnan</u>
Sue L. Robinson (Bar No. 1000658)
Brian E. Farnan (Bar No. 4089)
Michael J. Farnan (Bar No. 5165)
919 North Market Street, 12th Floor
Wilmington, DE 19801
Telephone: (302) 777-0300
Facsimile: (302) 777-0301
Emails:  srobinson@farnanlaw.com
         bfarnan@farnanlaw.com
         mfarnan@farnanlaw.com

***Of Counsel:***
Vincent R. Cappucci (*pro hac vice* forthcoming)
Robert N. Cappucci (*pro hac vice* forthcoming)
**ENTWISTLE & CAPPUCCI LLP**

230 Park Avenue, 3rd Floor
New York, New York 10169
Telephone:  (212) 894-7200
Facsimile:  (212) 894-7272
Email:  vcappucci@entwistle-law.com
         rcappucci@entwistle-law.com

*Counsel for Plaintiff*