# UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF DELAWARE

| | |
|---|---|
| WATER ISLAND MERGER ARBITRAGE INSTITUTIONAL COMMINGLED MASTER FUND, LP, GLAZER CAPITAL MANAGEMENT, L.P., GLAZER ENHANCED FUND L.P., GLAZER ENHANCED OFFSHORE FUND, LTD., GLAZER INDEX PLUS FUND, LTD., AND HIGHMARK LTD., IN RESPECT TO ITS SEGREGATED ACCOUNT HIGHMARK MULTI-STRATEGY 2, on behalf of themselves and all others similarly situated, | Case No. 1:23-cv-00701-CFC<br><br>CLASS ACTION<br><br>**JURY TRIAL DEMANDED** |

                                    Plaintiffs,

        v.

CORNERSTONE BUILDING BRANDS, INC.; CLAYTON, DUBILIER & RICE, LLC; CD&R PISCES HOLDINGS, L.P.; CLAYTON, DUBILIER & RICE FUND VIII, L.P.; CD&R FRIENDS & FAMILY FUND VIII, L.P.; GEORGE L. BALL; GARY L. FORBES; JOHN J. HOLLAND; WILLIAM E. JACKSON; WILBERT W. JAMES JR.; DANIEL JANKI; JOHN KRENICKI, JR.; ROSE LEE; JUDITH REINSDORF; and JEFFREY S. LEE, NATHAN K. SLEEPER, and KATHLEEN AFFELDT,

                                    Defendants.

## AMENDED CLASS ACTION COMPLAINT

## TABLE OF CONTENTS

I.    INTRODUCTION .............................................................................................2

II.   JURISDICTION AND VENUE .......................................................................4

III.  PARTIES .........................................................................................................4

      A.    Plaintiffs ..............................................................................................4

      B.    Defendants ...........................................................................................5

            1.    Cornerstone ...............................................................................5

            2.    The Director Defendants ...........................................................5

            3.    The Officer Defendants .............................................................7

            4.    The CD&R Defendants ..............................................................7

            5.    Relevant Non-Parties ................................................................9

IV.   FACTUAL BACKGROUND .........................................................................10

      A.    CD&R Has Long Been Cornerstone's Controlling Shareholder ...........................10

      B.    The 2018 Stockholders Agreement ....................................................12

      C.    CD&R Continued to Improperly Influence Cornerstone Rendering Its
            Management Conflicted .....................................................................13

      D.    CD&R Initiates Negotiations to Take Cornerstone Private in Violation of
            the Standstill Provisions of the 2018 Stockholders Agreement ..........................14

      E.    The Board Forms the Special Committee ...........................................15

      F.    Defendants and CD&R Continue to Engage in Merger Negotiations in
            Violation of the Standstill Provisions; Cornerstone's Management Revises
            Projections Downward at the Direction of CD&R ..............................19

      G.    The Divestiture of Cornerstone's Metal Coils Business Is Excluded from
            the Merger Consideration and Misleadingly Classified as a "Recent
            Development" .....................................................................................33

      H.    The Special Committee Recommends a Waiver of the Standstill
            Provisions After Those Provisions Are Breached ...............................35

V.    THE MATERIAL MISSTATEMENTS AND OMISSIONS OF FACT IN THE
      PROXY ..........................................................................................................37

A.  The Proxy Failed to Disclose that the Procedural Safeguards Designed to Ensure the Fairness of the Merger Consideration Were Negated by CD&R's Continued Ability to Influence the Key Financial Projections..............38

B.  The Proxy Misdescribed the Recency of the Coil Coatings Transaction Further Depressing the Projections Upon Which Valuation Was Based..............40

C.  The Proxy Contained Materially False or Misleading Statements Regarding CD&R's Offers to Acquire Cornerstone in Violation of the Standstill Provisions...............................................................................41

VI.    LOSS CAUSATION.........................................................................................49

VII.   INAPPLICABILITY OF STATUTORY SAFE HARBOR .............................49

VIII.  CLASS ACTION ALLEGATIONS ................................................................50

       COUNT I ........................................................................................................51

       COUNT II .......................................................................................................53

IX.    PRAYER OF RELIEF ....................................................................................55

X.     JURY DEMAND ............................................................................................56

Lead Plaintiffs Glazer Capital Management, L.P., Glazer Enhanced Fund L.P., Glazer Enhanced Offshore Fund, Ltd., Glazer Index Plus Fund, Ltd., and Highmark Ltd., in respect to its Segregated Account Highmark Multi-Strategy 2 (collectively the "Glazer Funds" or "Lead Plaintiffs"), and Plaintiffs Water Island Merger Arbitrage Institutional Commingled Master Fund, LP; Water Island Event-Driven Fund; The Arbitrage Fund; and iMGP Alternative Strategies Fund (the "Water Island Funds" and, with the Glazer Funds, "Plaintiffs"), bring this action (the "Action") on behalf of themselves and a class (the "Class") consisting of former shareholders of Cornerstone Building Brands, Inc. ("Cornerstone" or the "Company") that were harmed by Defendants' actions described herein for their violations of Sections 14(a) and 20(a) of the Securities Exchange Act of 1934 (the "Exchange Act"), 15 U.S.C. §§ 78n(a), 78t(a) and SEC Rule 14a-9, 17 C.F.R. § 240.14a-9, promulgated thereunder based on the deficient Definitive Proxy Statement (the "Proxy") filed with the U.S. Securities and Exchange Commission (the "SEC") on May 24, 2022, in connection with the "take-private" transaction (the "Merger" or "Transaction") of Cornerstone by Clayton, Dubilier & Rice, LLC ("CD&R").

Plaintiffs allege the following based upon personal knowledge as to themselves and their own acts and upon information and belief as to all other matters. Plaintiffs' information and belief is based upon, *inter alia*, the investigation conducted by or at the direction of undersigned counsel for Plaintiffs. This investigation includes, among other things, a review and analysis of: (i) internal Cornerstone documents; (ii) publicly filed pleadings in other proceedings; (iii) press releases, presentations, and other public statements issued by Cornerstone; (iv) Cornerstone's filings with the SEC; (v) media and analyst reports about the Company; (vi) documents filed in actions pending in the Delaware Court of Chancery; and (vii) other publicly available information and data

concerning Cornerstone.  The investigation is ongoing, and many of the relevant facts are known only by Defendants or are exclusively within Defendants' custody or control.

## I.    **INTRODUCTION**

1.      Cornerstone is the largest manufacturer of exterior building products in North America and is engaged in both the new construction and the remodel markets for residential and commercial customers.  CD&R controlled Cornerstone at the time of the Merger through its ownership of approximately 49% of the Company's outstanding common stock and its contractual right pursuant to the terms of a 2018 Stockholders Agreement to nominate members of Cornerstone's board of directors (the "Board") proportionate to the amount of Cornerstone stock CD&R held.

2.      On March 7, 2022, Cornerstone announced that it would be taken private by a corporate affiliate of CD&R based upon the terms of an Agreement and Plan of Merger dated March 5, 2022 (the "Merger Agreement") providing that CD&R would acquire the Cornerstone common stock (the "Common Stock") it did not already own for $24.65 per share in cash (the "Merger Consideration").  The Merger Agreement made the Transaction contingent on the approval of a majority vote of non-CD&R Common Stock shares.

3.      On May 24, 2022, Defendants issued the Proxy to obtain the necessary minority shareholder approval of the Merger.  In soliciting shareholder approval, the Proxy portrayed a robust arms-length negotiating process overseen by a special committee (the "Special Committee") of the Board in negotiating the Merger Consideration based upon projections purportedly independently prepared by the Company's management.

4.     The Proxy, however, failed to disclose material facts relevant to a reasonable shareholder's decision of whether to vote in favor of the Merger at a $24.65 per share price, including that:

a.     CD&R controlled the process through which the five-year financial projections supporting the fairness of the Merger Consideration had been created. Specifically, *conflicted members of Cornerstone management revised a set of Company projections downward in two key operating segments after CD&R advocated for such a downward revision in these exact same segments*. The downward revisions to the projections helped to support a lower per share price for CD&R's acquisition of Cornerstone's public shares;

b.     The discounted cash flow ("DCF") analysis prepared by Centerview Partners LLC ("Centerview"), Cornerstone's financial advisor, did not account for the sale of Cornerstone's $500 million metal Coil Coatings business to BlueScope Steel in April 2022; and

c.     The negotiating process was tainted by CD&R violating the standstill provisions contained in the 2018 Stockholder Agreement (the "Standstill Provisions") intended to protect the minority non-CD&R shareholders by, among other things, barring CD&R from making offers to acquire or propose to acquire additional shares of Cornerstone unless certain conditions were met.

5.     The failure to properly disclose these facts caused the Proxy to be materially false or misleading because that information would affect a reasonable shareholder's decision as to whether to vote in favor of the Merger.

6.     Plaintiffs bring this action under Sections 14(a) and 20(a) of the Exchange Act, 15 U.S.C. §§ 78n(a), 78t(a), and Rule 14a-9 promulgated thereunder by the SEC, 17 C.F.R. § 240.14a-9, to recover for materially false statements and omissions made in the Proxy.

## II.    JURISDICTION AND VENUE

7.      The claims asserted herein arise under Sections 14(a) and 20(a) of the Exchange Act, 15 U.S.C. §§ 78n(a), 78t(a), and Rule 14a-9 promulgated thereunder by the SEC, 17 C.F.R. § 240.14a-9.

8.      This Court has jurisdiction over the subject matter of this action pursuant to 28 U.S.C. §§ 1331 and 1337, and Section 27 of the Exchange Act, 15 U.S.C. § 78aa.

9.      Venue is proper in this District pursuant to 28 U.S.C. § 1391(b) and Section 27 of the Exchange Act, 15 U.S.C. § 78aa.  Venue is also proper because Cornerstone is—and was during the entire Class Period (defined below)—incorporated in this District.

10.     In connection with the acts alleged in this complaint, Defendants, directly or indirectly, used the means and instrumentalities of interstate commerce, including the United States mails, interstate telephone communications, and the facilities of the national securities markets.

## III.    PARTIES

### A.    Plaintiffs

11.     Lead Plaintiffs, the Glazer Funds, are a group of related investment funds, who are all advised by Glazer Capital Management LLC.  Lead Plaintiffs beneficially owned shares of Cornerstone common stock as of the May 16, 2022 record date ("Record Date") and as of the closing of the Merger on July 25, 2022 (the "Class Period") and were entitled to vote on the Merger, as set forth in the PSLRA certifications filed in connection with their motion to serve as Lead Plaintiff.  *See* ECF No. 11-2.  Lead Plaintiffs suffered damages resulting from the violations of the federal securities laws alleged herein.

12.     Additional Plaintiffs, the Water Island Funds, are a group of related investment funds, who are all advised by Water Island Capital, LLC.  The Water Island Funds held shares of

Cornerstone common stock during the Class Period and were entitled to vote on the Merger, as set forth in the PSLRA certifications filed in connection with their motion to serve as lead plaintiffs. *See* ECF No. 8-1.  The Water Island Funds suffered damages resulting from the violations of the federal securities laws alleged herein.

### B.    Defendants

#### 1.    Cornerstone

13.    Cornerstone Building Brands, Inc. ("Cornerstone") is a Delaware corporation headquartered in Cary, North Carolina.  Cornerstone traded on the NYSE under the ticker symbol "CNR" until the Merger closed on July 25, 2022, when Cornerstone became a privately held company.  CD&R owned approximately 49% of the Company's outstanding common stock at the time of the Merger.  Cornerstone is currently owned by Camelot Return Intermediate Holdings, LLC and Camelot Return Merger Sub, Inc., investment funds managed by CD&R.  Prior to the Merger, Cornerstone had three operating segments: (i) a Windows Segment, (ii) a Siding Segment, and (iii) a Commercial Segment.

#### 2.    The Director Defendants

14.    George L. Ball ("Ball") was a Cornerstone director from February 2014 through the close of the Merger.  Mr. Ball was also Chairman of the Special Committee.

15.    Gary L. Forbes ("Forbes") was a Cornerstone director from December 1991 through the close of the Merger.  Mr. Forbes was also a member of the Special Committee.

16.    John J. Holland ("Holland") was a Cornerstone director from November 2009 through the close of the Merger.  Mr. Holland was also a member of the Special Committee.

17.    William E. Jackson ("Jackson") was a Cornerstone director from May 28, 2020 through the close of the Merger.  Mr. Jackson was also a member of the Special Committee.

18.     Judith Reinsdorf ("Reinsdorf") was a Cornerstone director from August 19, 2021 through the close of the Merger. Ms. Reinsdorf also served on the Special Committee, which was formed one month after she joined the Board. Reinsdorf served as the Executive Vice President and General Counsel of Tyco International Limited from March 2007 through September 2016. In November 2010, Tyco was acquired by CD&R, and therefore, between November 2010 and September 2016, Reinsdorf was effectively employed by CD&R.

19.     Reinsdorf, Ball, Forbes, Holland, and Jackson, are collectively referred to herein as the "Special Committee."

20.     Kathleen Affeldt ("Affeldt") was a Cornerstone director from November 2009 through the close of the Merger. She has been a director of the post-Merger Company since August 8, 2022. Ms. Affeldt has a 30 year affiliation with CD&R, including as a director of several CD&R portfolio companies such as SIRVA, Inc., BTE Technologies, Inc., Sally Beauty Holdings, Inc., NCI Building Systems, Inc. ("NCI"), and HD Supply Holdings Inc., for which she earned over $4 million in director fees. During her tenure on the Board, Affeldt served on the Nominating and Corporate Governance Committee (the "NCGC"). Affeldt also worked at Lexmark International (a spin-off of IBM) between 1991—when CD&R conducted a leveraged buyout of IBM Information Products Corporation—and February 2003.

21.     Wilbert W. James, Jr. ("James") was a Cornerstone director from May 23, 2019 through the close of the Merger, and has been a director of the post-Merger Company since August 8, 2022.

22.     Daniel C. Janki ("Janki") was a Cornerstone director from May 23, 2019 through the close of the Merger, and has been a director of the post-Merger Company since August 8, 2022.

Mr. Janki worked at General Electric Company ("GE") for 29 years between 1992 and July 2021. As CFO of GE Energy, he reported directly to his co-defendant John Krenicki, Jr.

23.    The defendants identified in paragraphs 14-37 above are collectively referred to herein as the "Director Defendants."

### 3.    The Officer Defendants

24.    Jeffrey Lee has been Cornerstone's CFO from 2019 through the present. Before joining Cornerstone, Mr. Lee was the Senior Vice President and CFO of Wilsonart International Holdings LLC from 2014 to 2019, a position to which he was appointed by CD&R and reported to Mr. O'Brien (Wilsonart's CEO) and Mr. Krenicki (Wilsonart's Chairman). As Cornerstone's CFO between June 2019 and the Merger, Mr. Lee earned more than $5.6 million in base salary, bonus, Company stock and options and other benefits, including, in connection with his agreement to work as Cornerstone's CFO.

25.    Rose Lee has been a Cornerstone director and Cornerstone's CEO since September 6, 2021, and has been the CEO and a director of the post-Merger Company since the Merger closed. Prior to working at Cornerstone, Rose Lee worked at DuPont Water & Protection, creating water, shelter, and safety solutions. As Cornerstone's CEO between September 6, 2021 and the when the Merger closed, Ms. Lee received a $500,000 signing bonus, $1,000,000 base salary and Company equity awards valued at $8.5 million that entitled her to have at least 183,268 shares of Cornerstone common stock cashed out in the Merger.

26.    Defendants Rose Lee and Jeffrey Lee are collectively referred to herein as the "Officer Defendants."

### 4.    The CD&R Defendants

27.    Clayton, Dubilier & Rice, LLC ("CD&R") is a Delaware limited liability company with offices in New York and London which beneficially owned 212,723 shares of Cornerstone

stock before the Merger. CD&R has controlled Cornerstone since 2009, when it acquired a majority interest in Cornerstone's predecessor entity, NCI.

28.     CD&R Pisces Holdings, L.P. ("CD&R Pisces") is a Cayman Islands limited partnership through which CD&R beneficially owned approximately 39.1 million shares of Cornerstone common stock before the Merger. CD&R Pisces was a party to the 2018 Stockholders Agreement.

29.     Clayton, Dubilier & Rice Fund VIII, L.P. ("CD&R Fund VIII") is a Cayman Islands limited partnership through which CD&R beneficially owned approximately 22.7 million shares of Cornerstone common stock before the Merger. CD&R Fund VIII was a party to the 2018 Stockholders Agreement.

30.     CD&R Friends & Family Fund VIII, L.P. ("CD&R FF Fund VIII") is a Cayman Islands limited partnership through which CD&R beneficially owned 56,940 shares of Cornerstone common stock, accounting for 49.6% of outstanding shares, before the Merger. CD&R FF Fund VIII was a party to the 2018 Stockholders Agreement.

31.     CD&R Pisces, CD&R Fund VIII and CD&R FF Fund VIII are collectively referred to herein as the "CD&R Funds."

32.     John Krenicki, Jr. ("Krenicki") has been a Cornerstone director since November 2018, and is a director of the post-Merger Company. During his tenure on the Board, Mr. Krenicki served as Lead Director, and Chair of the NCGC and Executive Committee. Mr. Krenicki has been a CD&R partner since 2013 and is CD&R's Vice Chairman. CD&R designated Mr. Krenicki as a CD&R Investor Director to the Board. Mr. Krenicki joined CD&R after working at GE between 1984 and 2012. As alleged above, Defendant Krenicki was Defendant Janki's boss at GE for several years.

33.    Nathan K. Sleeper ("Sleeper") is the CEO of CD&R, which he joined in 2000. CD&R designated Mr. Sleeper as a CD&R Investor Director on the Board.  Mr. Sleeper was a Cornerstone director from November 2018 through the close of the Merger.  He has been a director of the post-Merger Company since August 8, 2022.

34.    CD&R, together with Krenicki and Sleeper are jointly referred to herein as the "CD&R Defendants."

### 5.    Relevant Non-Parties

35.    Timothy O'Brien ("O'Brien") is a CD&R Investor Director who joined the Board in November 2018.  He was a Cornerstone director through the close of the Merger and has been a director of the post-Merger Company since August 8, 2022.  Mr. O'Brien served on the NCGC during his tenure on the Board.  He has been the President and CEO of CD&R's portfolio company Wilsonart Engineered Surfaces since January 2013.

36.    Jonathan L. Zrebiec ("Zrebiec") is a CD&R partner and was designated as a CD&R Investor Director on the Board.  Mr. Zrebiec was a Cornerstone director from November 2009 through the close of the Merger.  He has been a director of the post-Merger Company since August 8, 2022.

37.    James S. Metcalf ("Metcalf") served as Cornerstone's CEO until his retirement on September 6, 2021.  Between September 6, 2021 and March 31, 2022, Metcalf served as the Board's Executive Chairman.  Metcalf was the Chairman of NCI prior to the merger of NCI and Ply Gem and oversaw the integration of the two companies.

38.    Camelot Return Intermediate Holdings, LLC ("Parent") was formed on February 22, 2022 for the sole purpose of completing the Merger.

39.    Camelot Return Merger Sub, Inc. ("Merger Sub") was formed on February 22, 2022 as an entity to complete the Merger.  Merger Sub is a direct, wholly owned subsidiary of Parent.

40.    Camelot Return Holdings, LLC ("Holdings") is a Delaware limited liability company and an indirect parent entity of Parent which was formed on February 22, 2022 for the purpose of managing Parent. Holdings is a direct, wholly owned subsidiary of Holdings Parent.

41.    Camelot Return Parent, LLC ("Holdings Parent") is a Delaware limited liability company that was formed on February 23, 2022, for the purpose of managing Holdings. Holdings Parent is a direct, wholly owned subsidiary of Ultimate Parent.

42.    Camelot Return Ultimate, LP ("Ultimate Parent") is a Delaware limited partnership that was formed on February 23, 2022 for the purpose of managing Holdings Parent.

43.    Camelot Return GP, LLC ("Ultimate Parent GP") is a Delaware limited liability company that was formed on February 22, 2022 for the purpose of serving as the general partner of Ultimate Parent.

44.    Parent, Merger Sub, Holdings, Holdings Parent, Ultimate Parent, and Ultimate Parent GP are collectively referred to herein as the "Camelot Entities." The Camelot Entities were effectively a shell company through which CD&R effectuated the Merger.

## IV.    FACTUAL BACKGROUND

### A.    CD&R Has Long Been Cornerstone's Controlling Shareholder

45.    CD&R effectively controlled NCI, Cornerstone's predecessor company. On August 14 2009, NCI and CD&R executed an investment agreement (the "2009 Investment Agreement"). Under the 2009 Investment Agreement, CD&R acquired a controlling interest in NCI through its purchase of 250,000 Series B preferred shares from NCI for $250 million, representing approximately 68.4% of NCI's voting power. Pursuant to the 2009 Investment Agreement, CD&R also appointed three of the six members of NCI's board of directors at the time, including Defendant Sleeper. As of November 2009, NCI's board consisted of nine

directors, five of whom were appointed by CD&R (*i.e.*, Zrebiec, Defendants Sleeper and Affeldt, as well as Lawrence Kremer and CD&R partner James Berges).

46.     Between 2010 and 2017, CD&R sold a portion of its NCI equity stake and retained the right to appoint four of NCI's twelve directors pursuant to a 2009 Stockholders Agreement. CD&R's five director appointees also remained on the NCI board.  The November 2018 merger (the "NCI/Ply Gem Merger") of NCI and Ply Gem Parent, LLC ("Ply Gem") resulted in the creation of Cornerstone.

47.     CD&R owned 49.6% of Cornerstone's common stock upon the closing of the NCI/Ply Gem Merger in November 2018. On April 11, 2019, NCI announced that it would change its name to Cornerstone.

48.     During the NCI/Ply Gem Merger process, CD&R controlled the NCI board and appointed a special committee in connection with the NCI/Ply Gem Merger (the "NCI Special Committee").  The NCI Special Committee approved a revised stockholders' agreement which came to be known as the 2018 Stockholders Agreement.  The 2018 Stockholders Agreement was executed between CD&R and Cornerstone and replaced the 2009 Stockholders Agreement that was between CD&R and NCI.

49.     Notwithstanding the NCI Special Committee's involvement in the NCI/Ply Gem Merger, shareholder litigation followed questioning the fairness of that transaction to NCI.  That action was ultimately settled for a $100 million cash payment by CD&R.

50.     Since 2018, when Cornerstone was formed through the NCI/Ply Gem Merger, CD&R has appointed six of Cornerstone's eleven directors (*i.e.,* O'Brien, Sleeper, and Zrebiec, as well as Defendants Krenicki, Affeldt, and Forbes).  Metcalf and Defendant Ball were also

effectively CD&R director designees, having been appointed as directors of NCI.  CD&R has thus largely controlled the Board since 2018.

**B.    The 2018 Stockholders Agreement**

51.    The 2018 Stockholders Agreement gave CD&R authority over certain elements of Cornerstone's governance in that it had: (i) consent rights over certain of Cornerstone's business activities, including significant acquisitions, divestitures, stock issuances, stock repurchases, dividend issuances, or new borrowings, which allowed CD&R to effectively control Cornerstone's operations; and (ii) the right to appoint Board members and director designees proportionate to the amount of Cornerstone common stock CD&R owned.  The 2018 Stockholders Agreement also contained "Standstill Provisions" which were intended to serve as a check to CD&R's power. These Standstill Provisions were supposed to restrict CD&R's ability to negotiate mergers or acquisitions involving Cornerstone; in other words, they were intended as a safety mechanism to protect Cornerstone's public shareholders from a potential abuse of CD&R's power by ensuring they receive an adequate control premium in any potential transaction involving Cornerstone and CD&R.

52.    Section 3.3(a) of the 2018 Stockholders Agreement prohibited CD&R from ***acquiring or proposing to acquire*** additional shares of Cornerstone Common Stock.  Section 3.3(a) specifically provides that CD&R "shall not, directly or indirectly":

> (i)   in any way acquire, offer or propose to acquire, or agree to acquire, in any manner (including by means of merger, consolidation, reorganization, recapitalization or otherwise), Beneficial Ownership of any securities of the Company . . . if immediately following such acquisition or agreement [CD&R] . . . would Beneficially Own . . . more than the Voting Interest or economic interest of the Company that [CD&R] held at Closing . . .  [or]

> (ii)   make any statement or proposal to the Board or any of the Company's representatives or stockholders regarding, or make any public announcement, proposal or offer with respect to, any Business Combination, merger, exchange or tender offer, recapitalization or similar transaction or recapitalization of debt.

53.    Section 3.3(a)(i) therefore prohibited CD&R from making offers or proposals to acquire additional Cornerstone stock "in any manner," including indirect or informal offers or proposals.  Section 3.3(a)(ii) also prohibited CD&R from making any statement or proposal to the Board, any Cornerstone representative, or any Cornerstone stockholder concerning a merger.

54.    Section 3.3(a)(ii) contained an exception that permitted CD&R to "privately communicate" a proposal "to the Board or the [CEO] . . . *as long as such communication would not, and would not reasonably be expected to, trigger public disclosure obligations for any Person*."[1]  That exception does not apply to Section 3.3(a)(i) of the 2018 Stockholders Agreement.

### C.    CD&R Continued to Improperly Influence Cornerstone Rendering Its Management Conflicted

55.    As of April 20, 2021, Cornerstone's Nominating & Corporate Governance Committee was chaired by a CD&R partner (Krenicki) and a majority of its other members (Holland, Affeldt, and O'Brien) who were also affiliated with CD&R.

56.    On August 3, 2021, after a search overseen by the CD&R-controlled Board, Cornerstone appointed Rose Lee as its CEO effective as of September 6, 2021.

57.    CD&R was further able to influence the process because the Merger did not constitute a "change in control" under the employment agreements of Rose Lee and Jeffrey Lee. Accordingly, CD&R was in a position to dictate both how and whether vested stock options would be paid out based upon the Merger Consideration and, if so, to what extent management would receive credit with respect to the unvested stock options in the new entity created by the Merger.

58.    At the time of the Merger, Jeffrey Lee owned a total of 524,438 vested options and 253,775 unvested options and Rose Lee owned 262,466 vested options and 397,081 unvested options.

---

[1] All emphases herein are added unless otherwise noted.

59.    The Company subsequently reported paying out a total of $41.6 million in cash to settle the vested options with Jeffrey Lee, who was reported to have received options awards valued at $4,976,000 and non-equity incentive compensation of $10,479,171 for a total of more than $15,725,000, a substantial multiple to his annual salary of $600,000.  Similarly Rose Lee received options awards of $9,920,000 and Non-Equity Incentive Plan Compensation of $1,920,000 for a total of $10,840,000, constituting a substantial multiple to her reported annual salary of $1,000,000.

60.    The unvested options also constitute a source of substantial future payments to Jeffrey Lee and Rose Lee, with the Company recording liabilities as of December 31, 2022 of $92.9 million and $16.0 million relating to those pre-Merger awards expected to be settled in cash. Rose Lee and Jeffrey Lee's ownership of those unvested options place them in a position to each receive over $10 million from those options.

61.    Despite their personal conflicts, the Officer Defendants and other conflicted members of Cornerstone management were present for, and participated in the selection of, the Special Committee's advisors.

**D.    CD&R Initiates Negotiations to Take Cornerstone Private in Violation of the Standstill Provisions of the 2018 Stockholders Agreement**

62.    As stated in the Proxy, "[i]n the summer of 2019, CD&R communicated to [Defendant] George L. Ball . . . ***CD&R's potential interest in exploring a transaction*** in which CD&R would acquire all of the outstanding shares of Company common stock not then-owned by CD&R stockholders."  CD&R indicated at this time that it would be prepared to consider an implied valuation of $10.00 per share of Cornerstone common stock.  Cornerstone viewed CD&R's valuation to be unattractive and terminated its consideration of a transaction.

63.    CD&R approached Cornerstone again in the fall of 2021 to discuss purchasing Cornerstone's outstanding common stock.  On September 16, 2021, Defendant Sleeper contacted Defendant Ball on behalf of CD&R to discuss a transaction involving Cornerstone's publicly held shares of Common Stock.  According to the minutes from a Board meeting on September 21, 2021, Defendant Sleeper informed Defendant Ball of "CD&R's interest in determining the Board's receptivity to, and interest in, the possibility of exploring and evaluating a potential transaction in which CD&R, alone or together with other investors, would acquire [Cornerstone]."

64.    Because CD&R had, at this point in time, intended to acquire Cornerstone's remaining publicly held Common Stock, CD&R was required to file an amended Schedule 13D, as required by the SEC.  Moreover, because CD&R's outreach to the Board triggered this disclosure requirement, it violated the Standstill Provisions in Section 3.3(a)(ii) of the 2018 Stockholders Agreement.   CD&R's proposal further violated Section 3.3(a)(i) of the 2018 Stockholders Agreement.  Nevertheless, the Proxy failed to disclose these material facts to Cornerstone's shareholders and instead misstated CD&R's true intentions by merely representing that Sleeper discussed CD&R's "potential interest" in acquiring Cornerstone.

### E.    The Board Forms the Special Committee

65.    In response to CD&R's expressed interest in a merger, the Board appointed the Special Committee on September 21, 2021.  One Special Committee member, Defendant Jackson, worked at GE for 15 years with O'Brien and Defendants Krenicki and Janki.  Krenicki, Janki, and O'Brien were CD&R partners and executives and also served on Cornerstone's Board.  Defendant Reinsdorf was the fifth member of the Special Committee and had joined the Board only one month earlier.

66.    The Board only gave the Special Committee authority to "identify, review and evaluate alternatives" to a potential acquisition by CD&R, but it had no authority to direct the

Board to enter into any alternative transaction. The Special Committee also lacked authority to decide whether the Standstill Provisions in the 2018 Stockholders Agreement should be waived and could only recommend "whether the Company should grant any waiver or amendment to the [2018] Stockholders Agreement necessary to enable CD&R to make a proposal to the Board with respect to a Potential Transaction." As detailed below (¶ 128) the Special Committee did not discuss a waiver of the Standstill Provisions until February 2022—long after CD&R had engaged in concrete negotiations to take Cornerstone private.

67.     The Special Committee met for the first time on a conference call later in the day on September 21, 2021. On the call, the Special Committee selected the law firm of Wachtell, Lipton, Rosen & Katz LLP ("Wachtell") as its legal advisor. Although the Board discussed the restrictions in the Standstill Provisions at its September 21, 2021 meeting, it neither attempted to enforce them nor did it grant a waiver to CD&R.

68.     Despite the fact that a waiver of the Standstill Provisions had not been granted, Merger negotiations proceeded between Cornerstone and CD&R. During its September 21 meeting, the Special Committee plainly recognized that they were in active negotiations with CD&R when Defendant Ball informed Defendant Sleeper, as CD&R's representative, that certain "information flows" between CD&R and Cornerstone provided for under the Stockholders Agreement would be suspended. The "information flows" that had previously been provided by Cornerstone to CD&R included: (i) monthly operating review documents and meetings, (ii) weekly dashboards presenting various operational and financial data from Cornerstone, (iii) weekly Cornerstone cash flow details, (iv) Cornerstone's monthly business results, (v) access to Cornerstone investor relations meetings, and (vi) access to regular Board meetings. The temporary suspension of this information to CD&R meant the parties were now negotiating in earnest on a

16

transaction.  As detailed below, CD&R would later be granted access to extensive Cornerstone information as part of its Merger-related due diligence of the Company.

69.     The Special Committee decided at its September 21 meeting to inform CD&R that Mark Gordon of Wachtell wanted to "begin conversing with CD&Rs legal counsel regarding certain process-related matters."

70.     In order to advance the merger negotiations between Cornerstone and CD&R, Mr. Gordon emailed Defendants Brenner and Jeffrey Lee on September 23, 2021 to discuss an outreach to potential financial advisors for the Special Committee.  Mr. Gordon's email indicated that the Special Committee had asked Mr. Lee to contact Lazard Ltd. ("Lazard"), Evercore, Inc. ("Evercore"), and Centerview "to determine their respective interest in being considered by the Special Committee" as its financial advisor.

71.     On September 24, 2021, CD&R informed the Special Committee through its counsel at Kirkland & Ellis LLP ("Kirkland") that CD&R "was not interested in selling or reducing its investment in the Company and would not vote to approve any alternative transaction that would result in any such sale or reduction."  In other words, given the Special Committee's limited authority and CD&R's significant ownership interest in Cornerstone, CD&R's position was tantamount to strong-arming the Special Committee such that it could only consider an acquisition bid by CD&R.

72.     On September 28, 2021, the Special Committee and Wachtell met with potential financial advisors regarding a CD&R acquisition.  Notably, several conflicted members of management attended the meeting, including Metcalf, Brenner, and Jeffrey Lee. Specifically, the Special Committee and Cornerstone management received presentations from Centerview, Evercore, and Lazard.

73.     Wachtell also informed the Special Committee at this meeting that CD&R had retained Kirkland as its legal counsel in connection with a potential transaction. Wachtell further reported to the Special Committee that Mr. Gordon had three separate telephone calls with Kirkland representatives on a Cornerstone–CD&R transaction since the Special Committee's first meeting on September 21, 2021.

74.     During the September 28, 2021 Special Committee meeting, Mr. Gordon also reported that "Kirkland had conveyed that CD&R view[ed] *itself as a potential acquiror* [sic] of shares of [Cornerstone], and [was] not interested in selling its shares of the Company, and that the Special Committee should assume CD&R would not support a sale to a third party."  Further demonstrating CD&R's intent to proceed with an acquisition of Cornerstone, the Special Committee was also informed that CD&R requested the Special Committee's permission to begin engaging with four banks regarding potential financing for an acquisition.

75.     Mr. Gordon also informed the Special Committee at this meeting that "Kirkland had confirmed that *CD&R would not surprise* the Company or Special Committee with an amendment to CD&R's Schedule 13D filing or other public disclosure," and would coordinate with the Company and Special Committee in advance of an amendment to CD&R's Schedule 13D filing.   The Proxy did not disclose the September 28 Special Committee meeting.

76.     The Special Committee—as well as Metcalf, Rose Lee, Brenner, and Jeffrey Lee—met again on September 29, 2021 to discuss the presentations given by Evercore, Lazard, and Centerview the day prior, as well as their proposed fees.

77.     On October 1, 2021, the Special Committee and management (*i.e.*, Metcalf, Rose Lee, Brenner, and Jeffrey Lee) again convened to discuss which financial advisor they would select. The meeting minutes reveal that the Special Committee authorized Defendant Ball to

engage Centerview.  But the Special Committee knew of the conflict of interest presented by retaining Centerview—after all, as further alleged *infra*, Centerview had done past and contemporaneous work on transactions involving CD&R Entities.  Once again, the Proxy did not disclose the Special Committee meetings on September 29 or October 1, 2021.

78.     At a meeting on October 4, 2021, the Special Committee retained Centerview as its financial advisor on a potential CD&R transaction and allowed management to provide select Cornerstone financial information to CD&R.  Centerview agreed to be paid on a contingent basis as the Special Committee's financial advisor.  Specifically, Centerview would be paid $5 million upon delivery of a fairness opinion and $15 million upon the completion of a transaction.

79.     The Special Committee met again on October 4, 2021 and authorized Cornerstone management to provide certain Company financial information to CD&R.  Wachtell representatives present at this meeting reviewed certain provisions of the 2018 Stockholders Agreement with the Special Committee.  Wachtell informed the Special Committee that should it decide to pursue a transaction involving Cornerstone's publicly-held shares, it was required "to determine whether the Company should grant any waiver or amendment to the Stockholders Agreement to enable CD&R to make a proposal to the Board with respect to a Potential Transaction."  Given this review by its legal counsel, the Special Committee was aware of the Standstill Provisions restrictions placed on CD&R.

**F.     Defendants and CD&R Continue to Engage in Merger Negotiations in Violation of the Standstill Provisions; Cornerstone's Management Revises Projections Downward at the Direction of CD&R**

80.     During a meeting on October 13, 2021, the Special Committee unanimously agreed to provide CD&R with full access to certain non-public materials, including Cornerstone's monthly business results.  The Proxy contains no reference to the October 13, 2021 Special

Committee meeting, or the fact that CD&R was given access to this Company information as part of its due diligence process on a transaction.

81.    On October 25, 2021, the Special Committee met to review management's financial projections and Centerview's preliminary analysis of Cornerstone as a standalone entity.  The Special Committee also met to discuss the "benefits, considerations and assumptions associated with the Company's strategic alternatives," including a sale to CD&R.  CD&R was the only transaction counterparty discussed at this meeting and as reflected in the minutes, "Centerview walked the Special Committee through an illustrative timeline for engaging with CD&R" on a transaction.  Centerview's presentation slides outlined a process where Cornerstone would share its long-term financial plan with CD&R and conduct a two-hour due diligence call with CD&R in late October or early November 2021.  Centerview's engagement timeline also contemplated additional due diligence by CD&R in mid to late November 2021, including access to a Cornerstone data room and follow-up due diligence calls between the companies with the goal of Cornerstone and CD&R "negotiat[ing] a definitive agreement" in late November or December 2021.

82.    During the Special Committee's October 25, 2021 meeting, Cornerstone management presented the Special Committee with five-year (*i.e.*, fiscal years 2022 through 2026) financial projections (the "October 25 Projections").  The October 25 Projections included (i) "base case," (ii) "downside case" and (iii) "upside case" scenarios for the Company, which measured financial metrics such as revenue, unlevered free cash flow, and adjusted earnings before interest, taxes, depreciation, and amortization ("Adjusted EBITDA").

83.    Centerview was provided with these Company projections on October 21, 2021 and prepared presentation materials based on the projections for the October 25 Special Committee

meeting. As noted above, Cornerstone's business was organized into the following three operating segments: (i) Windows Segment, (ii) Siding Segment, and the (iii) Commercial Segment. Centerview's October 25 presentation stated a "5-6% growth" in the Company's Windows Segment for fiscal years 2023 through 2026 using Cornerstone's "base case" financial projections. With respect to Cornerstone's Commercial Segment, Centerview's presentation stated that it would experience "[r]ecovery in '21E-'22E" and "3% growth by '26E" using Cornerstone's "base case" projections.

84.      Centerview also presented its initial DCF analysis based on management's three financial projection scenarios. The "downside case" DCF resulted in an implied share price range of $14-$25 per Cornerstone share. The "base case" DCF resulted in an implied share price range of $24-$39 per Cornerstone share. Centerview's "upside case" DCF resulted in an implied share price range of $42-$64 per Cornerstone share. Using the "base case" financial projections, Centerview's midpoint value was $31 per Cornerstone share. At its October 25 meeting, the Special Committee authorized Centerview and Company management to share this information with CD&R, including the "base case" and "upside case" projections prepared by Cornerstone management:



85.    As detailed further below (¶¶ 95, 97), Cornerstone management also presented its standalone DCF valuation of the Company using three separate sets of Company projections. Also on October 25, 2021, management told the Special Committee of "management's expectation that increased volume, strategic initiatives and pricing actions would support the projections in management's base case."  Neither the base case nor the upside case assumed any recession.

86.    The Special Committee met again on November 1, 2021 "to hear, and provide feedback on, a high-level dry run" of the transaction-related materials Defendants Rose Lee and Jeffrey Lee planned to present to CD&R representatives the following day.  The meeting minutes reflect that the purpose of the meeting with CD&R was to "communicate the [Company's] base case" financial projections to CD&R.

87.    On November 2, 2021, certain Centerview representatives, Cornerstone CEO Rose Lee, and Cornerstone CFO Jeffrey Lee conveyed the Company's "base case" financial projections to CD&R via teleconference.  In describing the November 2 teleconference, the Proxy falsely

stated that CD&R was provided with the "preliminary base case and upside case projections." Yet, the minutes from the November 5, 2021 Special Committee meeting indicate that the "upside case" projections were not shared with CD&R on the call.

88.    Defendants Rose Lee and Jeffrey Lee provided Centerview with revised Company financial projections on November 3, 2021 (the "November 3 Projections"). The November 3 Projections were substantially similar to the October 25 Projections and still included "base case," "upside case," and "downside case" projections for Cornerstone. The primary difference in the November 3 Projections was an adjustment to the Company's cash on hand to reflect the $75 million pre-tax settlement from litigation arising out of the 2018 NCI/Ply Gem Merger.

89.    The Proxy falsely stated that Centerview and Cornerstone management discussed the "upside case" financial projections with CD&R on this call when only the "base case" projections were discussed. The Special Committee met again on November 5, 2021 to discuss the teleconference with CD&R. According to the meeting minutes, the Special Committee instructed Centerview to "communicate to CD&R the Special Committee's openness to hearing a ***proposal*** from CD&R" based on the information provided to date.

90.    At the November 5 meeting, Adam Beshara of Centerview informed the Special Committee that among other Cornerstone financial information, CD&R "had also requested certain historical financial data from the Company to assist [CD&R] with their analysis." It was agreed that Centerview would work with Cornerstone management to compile additional operational and financial analyses to prepare for future diligence on a transaction with CD&R.

91.    On November 12, 2021, Sleeper and Zrebiec had a teleconference with Centerview representatives to discuss a potential transaction with CD&R. Sleeper and Zrebiec held executive positions at CD&R and both were CD&R designees to the Board at the time. In describing the

call, the Proxy stated that Sleeper and Zrebiec communicated that "CD&R would be prepared to consider exploring a potential transaction at an indicative valuation of $22.00 per share." Yet the Special Committee's minutes from a meeting held on November 15, 2021 to discuss the November 12 call demonstrate that the November 12th proposal was more than a hypothetical offer, it was, in fact, a tangible offer. The minutes stated that CD&R was "prepared to consider exploring ***an offer*** to purchase the shares in the Company not owned by [CD&R] at a value of $22 per share[.]" Such efforts by CD&R represented an "offer," "proposal," and "propos[al] to acquire" Cornerstone stock as defined in and in breach of the Standstill Provisions of the 2018 Stockholders Agreement. Rather than disclose this breach to Cornerstone shareholders, Cornerstone management perpetuated the breach by engaging in continued negotiations with CD&R over the next several months.

92.     During the meeting on November 15, Centerview told the Special Committee that CD&R reiterated it was not interested in selling or reducing its investment in Cornerstone. Rather, in furtherance of CD&R's efforts to acquire the outstanding publicly-held Cornerstone Common Stock, the Special Committee agreed—at the request of Sleeper and Zrebiec—to allow CD&R to engage Goldman Sachs & Co. and Royal Bank of Canada as possible sources of debt financing. Sleeper and Zrebiec had proposed these banks for CD&R's deal financing, further demonstrating that CD&R was serious about an actual transaction.

93.     A day after the Special Committee meeting, Centerview representatives reached out to inform Sleeper and Ball that the Special Committee wanted a higher valuation for Cornerstone Stock.

94.     On November 22, 2021, CD&R requested a call with Centerview and according to the Special Committee meeting minutes, "communicated that CD&R was now prepared to

consider exploring *an offer to purchase* the shares in the Company not owned by them at a value of $23 per share[.]"

95.     The Special Committee again met on November 23, 2021 to discuss CD&R's November 22 offer to acquire Cornerstone at $23.00 per share.  At this meeting, Centerview presented another DCF analysis to the Special Committee based on the November 3 Projections. Centerview's DCF valuations increased as a result of the $75 million settlement payment reflected in the November 3 Projections, resulting in the following: the per share price range increased by over $3 per share to (i) $27.50 to $42.25 per share using management's "base case" projections (up $3 per share from the October 25 Projections of $24 to $39); (ii)  $44.00 to $65.75 per Cornerstone share using management's "upside case" projections (up $2/share from the October 25 Projections of $42 to $64); and (iii) $18.50-$29.50 per Cornerstone share using management's "downside case" projections (up $4.50 from the October 25 Projections of $14 to $25).  The mid-points of these share price ranges were materially higher than the $23.00 per share offered by CD&R on November 22, 2021.

96.     Centerview's presentation on the November 3 Projections also stated a consistent five-year increase in net sales and gross profits in Cornerstone's Windows and Commercial Segments.  Specifically, Centerview's presentation showed an increase in net sales in the Windows Segment from $2.4 billion in 2021 to $3.4 billion in 2026, reflecting a Compound Annual Growth Rate ("CAGR") of 7% from 2021 to 2026.  The presentation similarly reflected increased net sales in the Commercial Segment from $1.5 billion in 2021 to $2.37 billion in 2026, reflecting a CAGR of 8% during this period.  With respect to the gross profits in Cornerstone's Windows Segment, Centerview's presentation reflected an increase from $479 million in 2021 to $878 million in 2026, representing a CAGR of 13% from 2021 to 2026.  The November 3 Projections also showed a

gross profit increase in Cornerstone's Commercial Segment from $371 million in 2021 to $579 million in 2026, representing a CAGR of 9% during this period.  In addition, the November 3 Projections showed an increase in the Adjusted EBITDA for the Windows Segment from $295 million in 2021 to $589 million in 2026, representing a 15% CAGR.  The Projections similarly reflected an increase in the Adjusted EBITDA for the Commercial Segment from $234 in 2021 to $376 in 2026, representing a 10% CAGR.

97.    As detailed further below, at the November 23 meeting, the Special Committee instructed Cornerstone management to create a single operating case for the Company's financial projections, rather than the "base case," "upside case," and "downside case" they had been using. As noted above, the Special Committee also instructed Centerview to tell CD&R that its November 22 offer to acquire Cornerstone for $23.00 per share was inadequate.  This message to CD&R was presumably based on Centerview's DCF analyses derived from the October 25 and November 3 Projections.  During the meeting, Centerview was instructed to inform CD&R that "the $23 per share *offer* [was] insufficient to transact."  The Special Committee nonetheless decided at this meeting that it should continue to engage with CD&R on a transaction at a higher per share price.

98.    On December 3, 2021, Defendants Rose Lee and Jeffrey Lee presented the requested single operating case projections to the Special Committee and shared it with Centerview (the "December 3 Projections"), which Mr. Lee noted were closest to the "base case" financial projections presented at prior Special Committee meetings.  Like the prior projections, the December 3 Projections reflected growth in Cornerstone's Windows and Commercial Segments over the next five years.  Specifically, the presentation showed an increase in net sales in the Windows Segment from $2.4 billion in 2021 to $3.1 billion in 2026, representing a CAGR of 5% during this period.  The December 3 Projections also reflected an increase in net sales in the

Commercial Segment from $1.58 billion in 2021 to 2.0 billion in 2026, representing a 6% CAGR. The December 3 Projections further indicated an increase in gross profits for Cornerstone's Windows Segment from $479 million in 2021 to $795 million in 2026, representing an 11% CAGR. The gross profits from Cornerstone's Commercial Segment were also projected to increase from $371 million in 2021 to $510 million in 2026, a 7% CAGR during this period. The Adjusted EBITDA in the Windows Segment increased from $295 million in 2021 to $519 million in 2026, representing a 12% CAGR. The December 3 Projections also reflected an increase in the Adjusted EBITDA from the Commercial Segment of $234 million in 2021 to $313 million in 2026, a 6% CAGR during this period. The Special Committee determined that the "December 3 Projections" would be provided to Centerview for its financial analyses going forward.

99.    Notwithstanding this Segment growth, the December 3 Projections assumed an overall 6% residential market decline in 2024 and a 6% commercial market decline in 2025. The December 3 Projections eliminated a total of $1.8 billion of net sales and a total of $280 million of free cash flow for 2024 through 2026.

100.    Thus, Cornerstone management assumed a significant recession in 2024 and 2025 affecting demand for the Company's products that was not present in the Company's prior "base case" and "upside case" projections. The Company's SEC filings fail to explain the basis for predicting a recession three and four years into the future or what newly received information justified that shift in expectations, or why management now believed it would not at least meet the base case projections.

101.    This new projection served to undercut Centerview's DCF analysis of Cornerstone's implied share price. Centerview's revised DCF based on the December 3 Projections resulted in a valuation range of $22-$34 per Cornerstone share representing a material

downward revision from Centerview's range of $27.50-$42.25 per share under the "base case" in the November 3 Projections. Notwithstanding the reduced share price range resulting from the December 3 Projections, CD&R sought a further downward revision from Cornerstone management to justify its offer price for the Company. CD&R continued its due diligence of Cornerstone throughout December 2021. On December 2, 2021, CD&R requested that Centerview help schedule calls with the heads of four different Cornerstone business units to address CD&R's questions. The Special Committee approved CD&R's due diligence request at a meeting on December 3, 2021.

102. The Special Committee next met on December 14, 2021 to receive a Centerview presentation on its updated financial analysis of CD&R's November 22 acquisition offer. According to the meeting minutes, CD&R's $23 per share offer was describe as an "expression of interest." Meanwhile, Centerview's presentation referred to CD&R's $23 November 22 offer as a "non-binding indication of interest[,]" an "*offer*" and a "*proposal*[.]" Centerview presented (and not for the last time) Cornerstone's top twenty public stockholders and their average cost basis, indicating the Special Committee was focused on agreeing to a clearing price that the Company's stockholders might approve.

103. The Special Committee met on December 20, 2021 to discuss a meeting between CD&R and Cornerstone management on December 16, and to receive additional financial analysis from Centerview. During this meeting, the Special Committee approved additional due diligence requests by CD&R concerning Cornerstone's business. During the December 20, 2021 meeting, the Special Committee also instructed Centerview to follow up with CD&R to request an "update[d]" "indication of value" if CD&R did not reach out first.

104.    On December 22, 2021, CD&R and Centerview held a call during which, according to the Special Committee's meeting minutes, "CD&R communicated that CD&R was willing to increase its expression of interest to $23.50 per share[.]" According to a subsequent presentation given to the Special Committee by Centerview, CD&R told Centerview that it was "[p]repared to increase *their offer* . . . from $23.00 to $23.50 per share."  CD&R further told Centerview that CD&R wanted to transact now to "take advantage of favorable current debt financing conditions." However, CD&R expressed concern about Cornerstone's projections regarding the Windows and Commercial Segments, thereby signaling that it wanted additional downward revisions in those segments.  As stated in Centerview's January 3, 2022 presentation to the Special Committee:

- [CD&R] [e]xpressed concerns around specific assumptions in the projections shared by [Cornerstone] Management:

- Windows volume – projected vs. historical trends, expected impact from new Home Depot business

- Materials pricing-cost spread – projected vs. historical trends for Commercial segment[.]

105.    Centerview informed Cornerstone's CFO, Jeffrey Lee, about CD&R's stated concerns regarding the Windows and Commercial Segments.

106.    On December 28, 2021, Jeffrey Lee emailed Adam Beshara at Centerview to specifically address the Windows and Commercial Segments identified by CD&R.  Jeffrey Lee's email noted "potential risks" that cut $49 million from the Commercial Segment and $9 million from the windows segment as follows:

**To:** Adam Beshara[abeshara@centerview.com]
**Cc:** Jack Sise[jsise@centerview.com]; Andrew Woeber[awoeber@centerview.com]; Ramon Zepeda[rzepeda@centerview.com]; Rose Lee[Rose.Lee@cornerstone-bb.com]; Alena S. Brenner[Alena.Brenner@Cornerstone-BB.com]
**From:** Jeff Lee[/O=EXCHANGELABS/OU=EXCHANGE ADMINISTRATIVE GROUP (FYDIBOHF23SPDLT)/CN=RECIPIENTS/CN=438F18AF431E46FAA49F4A69FCDB5708-JEFF LEE]
**Sent:** Tue 12/28/2021 3:54:31 PM Coordinated Universal Time
**Subject:** RE: Metals & HD volume
**Attachment:** Overall Risk to $77M EBITDA Plan based on current events.pptx
**Attachment:** Buildings Components Spread Analysis V3.xlsx
**Attachment:** USWG Consolidated Manufacturing KPI Dashboards 2022 Budget.xlsx

Adam, we are still working the Home Depot Analysis, but I wanted to pass along the potential risk to the 2022 plan with the following assumptions:

Commercial overall risk to plan of $49M
    1. Buildings spread / Ton (Price less material) plan of $1,918 / Ton reverts back to $1,478 by year end (Backlog support Q1)
    2. Components spread plan of $920 / Ton reverts back to $875 by year end

Windows overall risk to plan of $9M
    1. MFG efficiencies has a glide path to plan minutes per opening vs. the plan which has a immediate step up minutes per opening starting in Q1.
        A. Potential additional labor costs in Q1
        B. Potential risk to volume of 4% in Q1

Because the "risks" identified by Mr. Lee were for each year of the five-year December 3 Projections, the cumulative impact was to eliminate $253 million of total EBITDA from Cornerstone's Commercial Segment and $45 million of total EBITDA from the Windows Segment.

107.    The December 3 Projections were then revised by Jeffrey Lee (CFO) and Rose Lee (CEO) to reflect the downward revisions advocated by CD&R, making those projections CD&R's projections and not Cornerstone management's projections.

108.    On January 3, 2022, these revised projections were provided to the Special Committee (the "January 3 Projections").  On January 3, Mr. Lee also emailed Centerview to explain that the December 3 Projections would need to be reduced given purported issues in the Windows and Commercial Segments.  These were the only two segments of Cornerstone's business that were revised downward, and were the exact two operating segments identified by CD&R only two weeks earlier, lowering 2022E Adjusted EBITDA from $775 million to $725 million:

**To:** Jack Sise[jsise@centerview.com]; Ramon Zepeda[rzepeda@centerview.com]; Adam Beshara[abeshara@centerview.com]; Andrew Woeber[awoeber@centerview.com]
**Cc:** Rose Lee[Rose.Lee@cornerstone-bb.com]; Alena S. Brenner[Alena.Brenner@Cornerstone-BB.com]
**From:** Jeff Lee[/O=EXCHANGELABS/OU=EXCHANGE ADMINISTRATIVE GROUP (FYDIBOHF23SPDLT)/CN=RECIPIENTS/CN=438F18AF431E46FAA49F4A69FCDB5708-JEFF LEE]
**Sent:** Mon 1/3/2022 8:27:50 PM Coordinated Universal Time
**Subject:** Project Return - Updated forecast
**Attachment:** Base with Recession Model 11-30-21 - Consensus Forecast updated 1-3-21 for recent information and Q4 performance.xlsm

Centerview team,
Please see attached updated 5 year model for your review and comments. Over the past few weeks we have been updating our plan assumptions; in particular our views on 2022 as we conclude the 2021 year. As you are aware our industry operates in a dynamic everchanging environment. After further business reviews with our business unit presidents and finance leads, both Rose and I feel our forecast for 2022, and impact on subsequent years, needs to be revised to best reflect our current thinking based on the new operating environment. Over the past few months we have experienced a deterioration within our windows segment with regards to manufacturing inefficiencies and pricing delays. Our commercial segment has been able to get price over inflation and continues to perform with slightly lower than anticipated volume. However, overall bookings for our business, but more pronounced within our commercial business, have pulled back. Our Commercial Segment has seen a faster than anticipated change in steel costs assumptions which we believe will add pressure to maintain the projected spread per ton in 2022.
Taking the new information into consideration we have lowered our revenue and EBITDA projections for 2022 by $50M; taking the pre-acquisition EBITDA from $775M to $725M for the year.
Thanks,

109.    The downward revisions in the January 3 Projections, -- partially attributed to the Omicron variant of COVID-19 -- were at odds with the consistent growth in the Windows and Commercial Segments, including increased sales gross profits, and Adjusted EBITDA stated in the October 25, November 3, and December 3 Projections.  Indeed, Cornerstone's August 2021 net sales were 34.5% higher year-over-year, attributable to positive prices across all segments and higher volumes in the Windows Segment. Adjusted EBITDA was 15% higher year-over-year because of a favorable spread in the Commercial Segment.  Centerview's DCF analysis based on the January 3 projections resulted in a lower per share price range of $19.50 to $30.75.

110.    The Special Committee met again on January 7, 2022 to review Centerview's analysis of CD&R's $23.50 per share acquisition proposal.  The Special Committee authorized Centerview to inform CD&R that its acquisition proposal was insufficient, but that it would likely recommend a transaction at $25 per share to the Board.

111.    On January 12, 2022, CD&R's counsel at Kirkland conveyed to Wachtell that CD&R expected it could provide an acquisition price that would be acceptable to the Special Committee.  In order to do so, Kirkland indicated that CD&R would need two or three weeks of additional due diligence and further engagement with additional sources of debt financing to fund the acquisition.

112.    The Special Committee met again on January 13, 2022 with representatives from Wachtell and Centerview to discuss the merger negotiations with CD&R and Kirkland.  The Special Committee approved CD&R's request for several more weeks to conduct its due diligence on an acquisition and to line up additional debt financing sources.

113.    On January 28, 2022, at the direction of Defendant Ball, and after consulting members of the Special Committee, Centerview provided upward revisions to the January 3 Projections in order to encourage CD&R to increase its valuation of Cornerstone (the "February 3 Projections").

114.    From January 13, 2022 through February 6, 2022, CD&R continued to conduct due diligence on a potential transaction.  This included CD&R accessing a virtual data room that contained detailed information about Cornerstone.  CD&R also engaged with two additional sources of debt financing at this time.

115.    On February 7, 2022, CD&R communicated to Centerview its updated offer to acquire Cornerstone at $24.50 per share.  The Special Committee met again on February 9 and received a presentation from Centerview on CD&R's $24.50 per share proposal.  Centerview's presentation stated that CD&R had communicated it was "[p]repared to increase *the offer* to $24.50 per share for the shares not owned by [CD&R]," and that CD&R was "[p]repared to proceed expeditiously toward signing a definitive agreement."

116.    CD&R increased its offer to $24.65 per share of Common Stock on February 10, 2022.  CD&R described this indication of interest as its best and final, and reiterated that it would not sell its Cornerstone shares or approve an alternative transaction that would entail a dilution of its Cornerstone position.  It also stated that it would not permit a "go-shop" period after the

execution of a merger agreement to allow for consideration of potential topping bids by third parties.

G.    **The Divestiture of Cornerstone's Metal Coils Business Is Excluded from the Merger Consideration and Misleadingly Classified as a "Recent Development"**

117.    During the Merger negotiations, Cornerstone management was engaged in a parallel sales process for the divestment of Cornerstone's lucrative metal coil coatings business ("Coil Coatings"). Cornerstone ultimately agreed to sell Coil Coatings on April 10, 2022 for $500 million (the "Coil Coatings Transaction"), yet the Company's projections were not updated to reflect the sale proceeds. Nor did Centerview's DCF valuations reflect the expected future cash flow from the anticipated Coil Coatings sale. As further discussed in ¶¶ 143-45 below, the Proxy improperly characterized the Coil Coatings Transaction as a "Recent Development."

118.    When the Proxy was issued on May 24, 2022, Cornerstone management had already been considering a sale of the Company's Coil Coatings business for several years. Cornerstone's Coil Coatings business comprised a large portion of the Company's revenue. The business's 2021 net sales were approximately $214 million, constituting 11.3% and 3.8% of reported net sales for Cornerstone's Commercial Segment and overall business, respectively. In 2021, the Company identified Coil Coatings as a significant asset sale and engaged legal and financial advisors in connection with an anticipated sale for 2022. These concrete divestment plans for Cornerstone's Coil Coatings business occurred concurrently with Defendants' merger negotiations with CD&R throughout 2021.

119.    For example, Cornerstone's management informed the Board during its meetings on June 28 and August 19, 2021 that discussions on the sale of the Coil Coatings business were "[o]ngoing" and that Cornerstone received "[c]ontinue[d] interest" "from various parties."

120.    Cornerstone management was engaged in ongoing discussions concerning a potential divestment of Coil Coatings.  In particular, since January 2020, Cornerstone had been engaged in discussions with BlueScope Steel Limited ("BlueScope"), a company with which—to no surprise—CD&R had a prior business relationship (*i.e.*, on May 24, 2012, CD&R acquired a BlueScope subsidiary called Metl-Span LLC for $145 million in cash.)

121.    Cornerstone's management had also conducted due diligence on the Coil Coatings divestment, including the preparation of a management presentation in furtherance of a possible sale.  Cornerstone's management also told the Special Committee it was receiving "advice on strategy, negotiations and next steps" concerning a Coil Coatings divestment.

122.    After three years of expressing interest in acquiring Coil Coatings, BlueScope purchased the business in April 2022.

123.    Centerview recognized that a divestment of the Coil Coatings business would provide meaningful value for Cornerstone.  In its October 25, 2021 presentation to the Special Committee concerning a possible transaction with CD&R, Centerview identified "*Potential areas of focus: Coil Coaters*" as a divestment opportunity given that it "had a record month in September '21."  Centerview's presentation further stated that divestitures such as Coil Coatings could "[r]educe[] the burden on the company's growth / profitability profile and Management's focus," and that the "[p]roceeds can continue to help delever towards the Company's leverage ratio."

124.    Cornerstone's management later informed the Board at its December 2, 2021 meeting, that the **"[t]iming is right for pursuing the divestiture of [Coil Coatings]"** because of favorable earnings in the business.  Management also advised the Board about the benefits of a Coil Coatings divestment to Cornerstone's balance sheet:

> **Further portfolio re-orientation could be a key catalyst to unlocking value**[;]
> Removes perceived lower multiple business from portfolio and can streamline the

equity story[;] Proceeds could reduce leverage and be used for organic/inorganic growth in core businesses[.]

125.     Cornerstone's Management took concrete steps towards executing a divestment of the Coil Coatings business at this time.  The Board was informed at its December 2, 2021 meeting that Cornerstone management had already retained Sullivan & Cromwell LLP as its legal advisor on a Coil Coatings sale, Rothschild & Co. as its M&A advisor, and Alvarez & Marsal Transaction Advisory Group, LLC for accounting advisory work on a transaction.  Cornerstone management also identified BlueScope as a possible counterparty for a pre-sale process to begin in the first quarter of 2022.

126.     In January 2022, Cornerstone and BlueScope engaged in this pre-sale process for the Coil Coatings business.  BlueScope made significant efforts to acquire Coil Coatings over the next several months.  BlueScope sought to pre-empt the sale process, and by March 2022 had nearly completed its diligence on the Coil Coatings business.  Cornerstone concluded that other offers would be lower and that BlueScope was the most logical buyer.

127.     Given the advanced nature of the divestment negotiations with BlueScope, both Cornerstone management and the Board necessarily anticipated a sale of Coil Coatings when Centerview issued its fairness opinion on the CD&R Merger on March 5, 2022.  Despite this, Defendants never updated Cornerstone's projections (nor Centerview its DCF analysis) to account for Coil Coatings' favorable valuation.

## H.    The Special Committee Recommends a Waiver of the Standstill Provisions After Those Provisions Are Breached

128.     On February 11, 2022, the Special Committee met with representatives of Centerview and Wachtell to review a Centerview presentation on CD&R's $24.65 offer price. According to the minutes from that meeting, the Special Committee "determined that it would be in the best interests of the Company and its unaffiliated stockholders to seek to accept a transaction

with CD&R at a price of $24.65 per share."  The Special Committee also agreed to recommend the full Board grant a limited waiver of the Standstill Provisions in the 2018 Stockholders Agreement to allow CD&R to make a compliant proposal – notably, this was only done upon CD&R and Cornerstone agreeing to an acquisition price of $24.65 per share.  Not to mention, the waiver was a mere formality; CD&R had been negotiating with Cornerstone and its legal and financial advisors on an actual acquisition offer since at least September 2021.  In fact, during the five months between September 2021, and February 12, 2022—the day the Board finally approved a waiver of the Standstill Provisions—CD&R had made several offers to acquire Cornerstone.

129.    CD&R had expressed unwavering interest in taking Cornerstone private, conducted months of due diligence, engaged with sources of debt financing, reviewed countless financial analyses and projections about Cornerstone's business, and conducted merger negotiations with Cornerstone and the respective legal advisors at Kirkland and Wachtell. CD&R's conduct during this time frame expressly violated the Standstill Provisions.  On February 13, 2022, CD&R submitted a letter to the Special Committee proposing to acquire Cornerstone's outstanding publicly held stock for $24.65 per share and reiterated that it was its "best and final offer." Consistent with its position throughout their negotiations, CD&R reiterated in its letter that it was "only interested in acquiring all of the Common Stock not already owned by the CD&R Funds, and we are not interested in pursuing any potential alternative transaction."  CD&R's letter also expressly recognized its obligation to file an amended Schedule 13D to reflect its acquisition offer.

130.    CD&R belatedly disclosed its intention to acquire Cornerstone on February 14, 2022 when it filed an amended Schedule 13D attaching its February 13 offer letter to Cornerstone. As detailed below, the SEC subsequently sent Cornerstone two separate comment letters in May 2022 raising concerns with CD&R's belated Schedule 13D amendment given the clear-cut merger

36

negotiations that had been in process with Cornerstone for five months. The Proxy misleadingly characterized these negotiations as mere "indication[s] of interest" and CD&R's concrete acquisition offers as "indicative valuation[s]" to mask the fact that CD&R had been in violation of the Standstill Provisions for months and had failed to timely amend its Schedule 13D to comply with clear Exchange Act requirements.

131.    On March 5, 2022, the Special Committee met together with its legal and financial advisors at Wachtell and Centerview. The Special Committee unanimously voted to recommend the Merger to the Board and Metcalf proposed that the Special Committee's members be paid $40,000 each, with Ball receiving an additional $20,000 for serving as its chairperson.

132.    The Board unanimously approved the transaction later that same day. The Merger Agreement was executed on March 5, 2022, and the parties publicly announced the transaction on March 7, 2022.

133.    The Company issued the definitive Proxy on May 24, 2022. Cornerstone's stockholders voted to approve the Merger on June 24, 2022 and the transaction closed on July 25, 2022. The shareholder vote was not fully informed because the Proxy contained material misstatements and omissions of material fact as detailed in Section V below.

## V.    THE MATERIAL MISSTATEMENTS AND OMISSIONS OF FACT IN THE PROXY

134.    Cornerstone's Proxy contained several material misstatements and omitted material facts regarding: (1) the financial projections on which the fairness of the Merger Consideration was based, which were revised downward at the direction of CD&R so that it could pay a lower price for Cornerstone's outstanding common stock; (2) the classification of the Coil Coatings Transaction as a "recent development," the omission of its lucrative sale proceeds from Cornerstone's DCF analysis, and accordingly exclusion from the Merger Consideration; and (3)

the scope of the 2018 Standstill Provisions, and CD&R's repeated violations of the Standstill Provisions. As a result of these material misstatements and omissions, CD&R improperly influenced the merger negotiations resulting in a lower valuation of Cornerstone's business.

**A.    The Proxy Failed to Disclose that the Procedural Safeguards Designed to Ensure the Fairness of the Merger Consideration Were Negated by CD&R's Continued Ability to Influence the Key Financial Projections**

135.    Page 35 of the Proxy states that:

> The Special Committee and the Board believe that sufficient procedural safeguards were and are present to ensure the fairness of the merger and to permit the Special Committee and the Board to represent effectively the interests of the unaffiliated stockholders.

136.    This statement was materially false and misleading when made because it omitted to disclose that CD&R had influenced Cornerstone's management to generate financial projections designed to support a Merger price lower than Company's true value. This statement also omits to disclose that these downward projections were made at the direction and benefit of CD&R. Management prepared these financial projections which were integral to the Special Committee and Centerview's valuation of the Merger with CD&R resulting in a lower Merger Consideration.

137.    The downward revisions to the January 3 Projections impacted Centerview's DCF analysis resulting in an implied share price range of $19.50-$30.75 per Cornerstone share, representing a material decrease in the implied share price of $22-$34 per Cornerstone share under Centerview's December 3 Projections DCF.

138.    The Proxy failed to disclose that the downward revisions were based upon CD&R's suggested changes to the prior projections.  The Proxy falsely stated that:

> [m]embers of senior management explained that they had prepared a revised plan for fiscal year 2022 after considering, in their best judgment, the probable impact of the current market environment on Cornerstone's business, with particular focus on the ability of Cornerstone to achieve operational improvements in its windows business unit and the likelihood of maintaining favorable steel pricing.

139.    A later section of the Proxy similarly misstated the origin of the downwardly revised January 3 Projections:

> In early January 2022, the Company's management subsequently updated the December 3 Projections to reflect a downward revision to management's forecast for fiscal year 2022 after considering, in their best judgment, the probable impact of the current market environment on the Company's business, with particular focus on the ability of Cornerstone to achieve operational improvements in one of its significant business lines, and the likelihood of maintaining favorable steel pricing (the "January 3 Projections").

140.    The statements in ¶¶ 138-39 above were materially false and misleading because they omitted to disclose that the January 3 Projections were created in response to CD&R's critique of the December 3 Projections. This is evident from Cornerstone's internal documents, which show that Jeffrey Lee revised the December 3 Projections downward in the windows and commercial Segments, which were the same operating segments identified by CD&R for downward revision. These revisions were contrary to the consistent estimated growth in the windows and commercial Segments found in the Company's projections only a month or two earlier (*i.e.*, the November 3 and December 3 Projections).

141.    The Proxy therefore gave the false impression to Cornerstone shareholders that the downward revisions in the January 3 Projections were based solely on Cornerstone management's forecasts concerning the Company's windows and commercial segments, when, in fact, they reflected CD&R's desired revisions and helped to justify a lower per share acquisition price for Cornerstone's public shares.

142.    The December 3 Projections were also materially misleading and proved to be unduly pessimistic, with Cornerstone reporting 2022 Combined Adjusted EBITDA of $799,386,000 in its 2022 Form 10-K. Lowering the December 3 Projections in the form of the January 3 Projections was further materially false or misleading because it vastly underestimated the Company's 2022 Adjusted EBITDA.

**B.**    **The Proxy Misdescribed the Recency of the Coil Coatings Transaction Further Depressing the Projections Upon Which Valuation Was Based**

143.    Defendants also omitted from the Proxy material information about the Company's sale of Coil Coatings, one of its most lucrative business segments, for $500 million thus rendering the statements in the proxy about this divestiture, misleading.  In particular, under the "Recent Developments" section of the Proxy it states:

> On April 10, 2022, the Company entered into a Membership Interest Purchase Agreement (which we refer to as the "Coil Coatings Purchase Agreement") with BlueScope Steel North America Corporation, a Delaware corporation ("BlueScope") and a subsidiary of BlueScope Steel Limited, to sell the Company's metal coil coatings business to BlueScope for an aggregate purchase price of $500 million in cash, subject to certain customary adjustments (the "Coil Coatings Transaction"). The Coil Coatings Transaction is subject to the satisfaction of customary closing conditions, including the expiration or termination of the waiting period under the HSR Act. Subject to the satisfaction or waiver of certain conditions and the other terms and conditions of the Coil Coatings Purchase Agreement, the Coil Coatings Transaction is expected to close in the second half of 2022. Pursuant to the merger agreement, Parent consented to the Company's entry into the Coil Coatings Purchase Agreement. Neither the entry into the Coil Coatings Purchase Agreement nor the consummation of the Coil Coatings Transaction will result in any change to the merger consideration to be paid to holders of shares of Company common stock in connection with the merger.

144.    The Proxy misleadingly classified the Coil Coatings transaction as a "Recent Development[]" when, in fact, BlueScope's acquisition of Cornerstone's Coil Coatings business had been underway since at least 2020, was definitely a consideration in the merger negotiations between CD&R and Cornerstone and thus should have been part of the Merger Consideration.

145.    These statements were materially misleading because they classify the $500 million sale of Coil Coatings as a "Recent Development" while failing to disclose that (i) BlueScope had wanted to buy Coil Coatings for at least three years and (ii) BlueScope's acquisition of Cornerstone's Coil Coatings business had been underway since at least January 2020; or (iii) as of December 2, 2021, Cornerstone management was prepared to sell its Coal Coatings business and had indeed identified parties, including BlueScope, to negotiate with on a transaction. These facts

40

render the Proxy's classification of the Coil Coatings Transaction as a "recent development" inaccurate. This statement is also materially misleading because it suggests that the Coil Coatings Transaction would not affect the Merger Consideration while omitting to disclose to shareholders that all of the negotiations and transactions concerning the divestment of Cornerstone's Coil Coatings business occurred *concurrently* with the Merger negotiations between CD&R and Cornerstone, and thus should have been included in the Merger Consideration.  Instead, that divestiture was expected to have the effect of increasing the price of Company Stock.

### C.    The Proxy Contained Materially False or Misleading Statements Regarding CD&R's Offers to Acquire Cornerstone in Violation of the Standstill Provisions

146.    Defendants repeatedly misstated in the Proxy CD&R's offers to acquire Cornerstone which concealed the fact that CD&R's acquisition proposals violated the Standstill Provisions in the 2018 Stockholders Agreement.  The Proxy's references to CD&R's interest in or efforts to acquire the remaining publicly held Cornerstone common stock are materially false or misleading because they misrepresented the nature of CD&R's offers by casting them as mere hypotheticals, when, in actuality, CD&R had already begun to actively pursue its acquisition of Cornerstone in direct violation of the Standstill Provisions.

147.    Regarding CD&R's September 2021 initiation of a take-private transaction with Cornerstone, the Proxy stated that:

> [o]n September 16, 2021, Mr. Sleeper, acting in his capacity as a representative of CD&R, contacted Mr. Ball [a Board member] to inform Mr. Ball of CD&R's potential interest in determining the Board's receptivity to, and interest in, the possibility of exploring a potential transaction in which CD&R would acquire all of the outstanding shares of Company common stock not already owned by the CD&R Stockholders.

148.    This statement was materially false and misleading because it failed to disclose that CD&R's outreach on an acquisition of the outstanding shares of Cornerstone Common Stock

violated Section 3.3(a)(i) of the Standstill Provisions as an "indirect[]" "propos[al]" to acquire all of Cornerstone's outstanding shares.  CD&R's communication also violated Section 3.3(a)(ii) because it was a "statement" to a Board member that was later conveyed to the full Board "regarding . . . a merger."  CD&R's statement was not covered under the safe harbor for Section 3.3(a)(ii).  This is because CD&R was required to file an amended Schedule 13D at this point since it had formulated an intention or plan to change its beneficial ownership of Cornerstone stock.  The Proxy's omission of these material facts rendered the above statement about CD&R's acquisition outreach materially false and misleading.

149.    The Proxy also falsely stated the scope of the Standstill Provisions in the 2018 Stockholders Agreement.  In recounting the September 16 communication between Mr. Sleeper (as a CD&R representative) and Mr. Ball, the Proxy falsely described the prohibitions under the Standstill Provisions as follows:

> [Sleeper and Ball] also discussed that, in light of the standstill restrictions under the Company's stockholders agreement, a limited waiver of the standstill restrictions would be required ***before CD&R would be permitted to make a formal proposal***[.]

150.    This statement was materially false and misleading when made because a waiver of the Standstill Provisions prohibited CD&R from making any formal or informal offer or proposal to acquire Cornerstone.  The Standstill Provisions prohibited any statement or offer to the Board regarding a merger with Cornerstone whether the offer was formal or informal.

151.    The Proxy also falsely stated that: "CD&R would not make a formal proposal unless and until invited to do so by a special committee of independent directors."

152.    This statement was materially false or misleading because CD&R in fact engaged in concrete merger negotiations with Cornerstone over the course of the next several months.  This included such formal steps as CD&R's extensive due diligence on Cornerstone, the retention of

legal and financial advisors by both CD&R and Cornerstone, CD&R's engagement with debt financing sources to fund an acquisition, and multiple price proposals by CD&R to acquire all of Cornerstone's outstanding common stock.

153.    In describing the Special Committee's meeting on November 5, 2021 to discuss a November 2 teleconference with Cornerstone management, Centerview and CD&R representatives, the Proxy stated that the Special Committee was *"open to hearing an indication of value from CD&R."*

154.    This statement was materially false and misleading because as of November 5, 2021, the Special Committee was in fact receptive to an actual transaction proposal from CD&R.

155.    The falsity of this statement is shown in minutes from the Special Committee's November 5, 2021 meeting, which stated that the Special Committee instructed Centerview to "communicate to CD&R the Special Committee's openness to hearing a *proposal* from CD&R" based on the information provided to date.  Therefore, the Proxy's characterization concealed the fact that CD&R and Cornerstone were actually in the process of transaction negotiations, in violation of the Standstill Provisions at the time of the November 5, 2021 meeting.

156.    The Proxy also falsely stated CD&R's communication with Centerview on November 12, 2021 regarding a potential acquisition of Cornerstone.  The Proxy stated that: during a teleconference on that date, Sleeper and Zrebiec communicated to Centerview representatives that *"if invited by the Special Committee, CD&R would be prepared to consider exploring a potential transaction at an indicative valuation of $22.00 per share of Company common stock."*

157.    This statement was false because CD&R had in fact communicated its interest in an actual offer to acquire Cornerstone in violation of the Standstill Provisions.  Contrary to the statement in the Proxy, the minutes from the Special Committee's November 15, 2021 meeting

state that Sleeper and Zrebiec indicated CD&R was "prepared to consider exploring **_an offer to purchase_** the shares in the Company not owned by them at a value of $22 per share[.]"

158.   The Proxy also falsely stated that CD&R's updated acquisition proposal on November 22, 2021 at an offer price of $23 per Cornerstone share.  The Proxy stated that on November 22, CD&R told Centerview it **_"would be prepared to consider exploring a potential transaction at an indicative valuation of $23.00 per share."_**

159.   This statement was false and misleading because minutes from the Special Committee meeting on November 23, 2021 show that the offer price from CD&R was not a mere "indicative valuation."  The minutes state that CD&R "communicated [to Centerview] that CD&R was now prepared to consider exploring **_an offer to purchase_** the shares in the Company not owned by them at a value of $23 per share[.]"

160.   Centerview also made a presentation at the November 23 Special Committee meeting that repeatedly acknowledged CD&R had made an actual offer to acquire Cornerstone.  For example, Centerview specifically noted that CD&R was "[p]repared to increase **_their offer_** for the shares not owned by them from $22 to $23 per share."  The Centerview presentation made the following additional references to CD&R's offer or proposal to acquire Cornerstone:

- A slide stated: "The presentation materials included herein include an overview of [CD&R]'s **_updated proposal_** and Centerview's preliminary financial analysis";

- Section 1 included a "Review of [**_CD&R's] Updated Proposal_**."

- Page 11, under the subheading "Implied Share Price," describes the $23 per share consideration as "COPY [*i.e.*, **_CD&R] Offer_** on 11/22/21: $23.00."

- Page 17 provided Centerview's financial analyses using an "[a]ssume[d] **_Offer Price_** of $23.00 per share."

- Page 25, Centerview's Historical Return Trading and Value vs. Peers analysis, characterized the $23 per share consideration as "COPY **_Offer: $23.00_**."

161.    Despite this clear acknowledgment by the Special Committee's financial advisor that CD&R was making an actual offer to acquire Cornerstone, the Proxy misleadingly described it as CD&R's "indicative valuation" of Cornerstone stock.

162.    Following the Special Committee's rejection of CD&R's $23 per share offer, CD&R continued conducting due diligence on Cornerstone in December 2021.  This included a conference call between CD&R representatives and members of Cornerstone management on December 16, 2021.

163.    The Proxy states that on December 22, 2021, Sleeper and Zrebiec, on behalf of CD&R, communicated to Centerview that "if invited by the Special Committee, CD&R would be prepared to consider exploring a potential transaction at an indicative valuation of $23.50 per share of Company common stock."  This statement materially misrepresented the state of merger negotiations between CD&R and Cornerstone.  Contrary to the equivocal description in the Proxy, CD&R had once again communicated an offer to acquire Cornerstone without a waiver of the Standstill Provisions.  In fact, CD&R told Centerview on a December 22 telephone call that it was "[p]repared to increase *their offer* for the shares not owned by them from $23.00 to $23.50 per share."

164.    The Special Committee met on January 7, 2022 to discuss CD&R's December 22 offer.  Following Centerview's presentation at this meeting, the Special Committee determined that CD&R's offer price of $23 per share was insufficient but indicated that it would be receptive to an offer price closer to the $25 per share range.

165.    On January 12, 2022, CD&R's counsel at Kirkland told Wachtell that CD&R anticipated it could propose an acceptable acquisition price for the Special Committee but would

need two or three weeks to conduct additional Cornerstone due diligence and engage with debt financing sources.  The Proxy misleadingly stated that:

> "[D]uring this conversation, the Kirkland [] representative reaffirmed that CD&R would not make a proposal unless invited to do so by the Special Committee and then only subject to an appropriate waiver of the Standstill Provisions of the 2018 Stockholders Agreement that would otherwise prohibit CD&R from making a proposal."

This statement was materially false and misleading because CD&R had been making concrete acquisition proposals in violation of the Standstill Provisions since at least September 16, 2021.

166.    Following its additional Cornerstone due diligence over the course of the next three weeks, CD&R made an updated acquisition proposal on February 7, 2022 of $24.50 per Cornerstone share.  The Proxy used the same misleading formulation in describing CD&R's revised February 7 offer.  Specifically, the Proxy stated that Sleeper and Zrebiec told Centerview's representatives that "***if invited by the Special Committee, CD&R would be prepared to consider exploring a potential transaction at an indicative valuation of $24.50 per share.***"

167.    This statement was false and misleading because CD&R had made an actual offer to acquire Cornerstone at a price of $24.50 per share in violation of the Standstill Provisions.  This is evidenced by Centerview's February 9 presentation to the Special Committee stating that CD&R had communicated it was "[p]repared to increase ***the offer*** to $24.50 per share for the shares not owned by [CD&R]," and that CD&R was "[p]repared to proceed expeditiously toward signing a definitive agreement."  Centerview's presentation further stated that CD&R's offer of $24.50 represented an increase in CD&R's "offer[s]" on November 12, November 22, and December 22.

168.    Following multiple conversations between representatives of CD&R and Centerview, CD&R increased its offer price to $24.65 per Cornerstone share on February 10, 2022.  The Proxy once again concealed that this represented a formal acquisition offer by CD&R that

violated the Standstill Provisions.  Rather than acknowledge this, the Proxy repeated that: *"if invited by the Special Committee, CD&R would be prepared to consider exploring a potential transaction at a best and final indicative valuation of $24.65 per share."*

169.    This statement was false and misleading because $24.65 per share was CD&R's best and final offer price, not an "indicative valuation" as described to stockholders.

170.    The Board did not approve a waiver of the Standstill Provisions in the 2018 Stockholders Agreement until February 12, 2022.  The next day, CD&R sent a proposal letter to Cornerstone on February 13, 2022 at the $24.65 acquisition price.

171.    On February 14, 2022, CD&R finally amended its Schedule 13D filing with the SEC to reflect its proposal to acquire Cornerstone.  The SEC criticized CD&R's failure to amend its Schedule 13D earlier given CD&R's clear intent to increase its beneficial ownership of Cornerstone stock over the prior five to six months.  The SEC's letters to CD&R support the conclusion that CD&R made actual offers to acquire Cornerstone and demonstrate the falsity of the Proxy's statements in this regard.

172.    On May 2, 2022, the SEC sent CD&R's counsel at Wachtell a letter in response to the Preliminary Proxy and Schedule 13e-3 transaction statement Cornerstone filed on April 7, 2022 in connection with the Merger.  The SEC's letter stated:

> We note the disclosure in the Background of the Merger section referring to various events of interaction between the CD&R entities and the company and that none of those events resulted in the filing of an amendment to the Schedule 13D filed by any of the CD&R entities.  Please advise us why the CD&R entities did not file an amendment to report a change in their plans for the company shares in "the summer of 2019," on September 16, 2021, on November 12 and 22, 2021 (the earlier instance coupled with an indication that CD&R was interested in contacting financing sources) and continuing until February 14, 2022 in connection with its expressions of interest in and negotiations for an acquisition of the company's shares not already owned by CD&R.

173.    The SEC's letter demonstrates that CD&R had made concrete proposals to acquire Cornerstone contrary to the above statements in the Proxy, which warranted an amendment to CD&R's Schedule 13D.

174.    The Company responded to the SEC on May 9, 2022, stating that it believed that CD&R had complied with its obligations and copying CD&R's counsel. The SEC replied to Cornerstone in a May 2022 letter disputing Cornerstone's assertion that CD&R had complied with its obligations under Schedule 13D by noting CD&R's definitive actions in furtherance of a Cornerstone acquisition.  As detailed in the SEC's letter, this included the facts that:

- ["]in 'the summer of 2019' CD&R communicated to 'George L. Ball, an independent director who had served as chairman of the special committee . . ., CD&R's potential interest in exploring a transaction in which CD&R would acquire all of the outstanding shares of Company common stock not then owned by the CD&R Stockholders.';

- on September 16, 2021, CD&R again expressed its interest in a similar transaction;

- between September and November 2021, the company's board of directors and management took various actions in response to CD&R's communications, including establishing a special committee, and allowing Cornerstone management to provide a briefing to CD&R relating to the company's financial update and operating, financial and strategic plans and sharing two sets of projections;

- on November 12 and 22, 2021, CD&R provided and increased, respectively, a quantified indicative value to Cornerstone;

- on November 12, 2021, CD&R asked for (and, on November 15, 2021 received) permission from Cornerstone to contact financial sources for the transaction; and

- until February 14, 2022, CD&R and Cornerstone took several more actions that, together with the events referenced above, indicated that CD&R had materially changed its position with respect to its investment in Cornerstone.["]

175.    The SEC's letter demonstrates that CD&R's actions warranted an amendment to CD&R's Schedule 13D.  The SEC's correspondence further establishes that the Proxy's generic description of CD&R's "indicative valuation[s]" was materially false and misleading.

176.    CD&R's breaches of the Standstill Provisions was material to investors. Had Cornerstone shareholders known that the Merger negotiation process was conducted in violation of the very provision that was designed to protect them from the undue influence of CD&R, they likely would have been reluctant (or even entirely opposed) to approving the Merger.

## VI.    LOSS CAUSATION

177.    As described herein, Cornerstone, the Director Defendants, and the Officer Defendants made materially false and misleading statements and omissions of material fact in the Proxy.  Their materially false and misleading statements and omissions as set forth above caused Plaintiffs and members of the Class to accept the Merger Consideration that failed to adequately value Cornerstone's common stock.  As a result of their ownership of Cornerstone common stock, Plaintiffs and other Class members suffered damages.

## VII.    INAPPLICABILITY OF STATUTORY SAFE HARBOR

178.    The statutory safe harbor provided for forward-looking statements under certain circumstances does not apply to any of the false statements alleged in this Complaint. The statements alleged to be false and misleading herein all relate to then-existing facts and conditions.

179.    To the extent that certain challenged statements may be characterized as forward looking, the statutory safe harbor does not apply to statements made in connection with a take private transaction.  15 U.S.C. § 78u–5(b)(1)(e). To the extent that the statutory safe harbor is determined to apply to any forward-looking statements pleaded herein, Defendants are liable for those false forward-looking statements because at the time each of those forward-looking

statements were made, the speaker had actual knowledge that the forward-looking statement was materially false or misleading, and/or the forward-looking statement was authorized or approved by an executive officer of the Company who knew that the statement was false when made.

## VIII.   CLASS ACTION ALLEGATIONS

180.    Plaintiffs bring this Action on their own behalf and as a class action, pursuant to Rule 23 of the Federal Rules of Civil Procedure, on behalf of all former holders of Cornerstone common stock as of the Record Date and the closing of the Merger (the "Class").  Excluded from the Class are Defendants and any person, firm, trust, corporation, or other entity related to, or affiliated with, any of the Defendants.

181.    This Action is properly maintainable as a class action.

182.    The Class is so numerous that joinder of all members is impracticable. According to the Proxy, as of May 16, 2022, members of the Class held more than 63 million shares of outstanding Cornerstone common stock. Upon information and belief, there are hundreds or thousands of members of the Class.

183.    There are questions of law and fact that are common to the Class, including, among others:

a.    Whether Cornerstone, the Director Defendants, and the Officer Defendants violated Section 14(a) of the Exchange Act and Rule 14a-9 promulgated thereunder;

b.    Whether the Director Defendants, the Officer Defendants, and the CD&R Defendants are liable as control persons within the meaning of Section 20(a) of the Exchange Act; and

c.    Whether Plaintiffs and the other members of the Class are entitled to damages as a result of Defendants' misconduct and, if so, the proper measure of damages.

184.    Plaintiffs' claims are typical of those of the Class because Plaintiffs and the Class have been damaged by Defendants' wrongful conduct.

185.    Plaintiffs will adequately protect the interests of the Class and have retained counsel experienced in class action securities litigation.  Plaintiffs have no interests that conflict with those of the Class.  All members of the Class have suffered the same harm.

186.    The prosecution of separate actions by individual members of the Class would create the risk of inconsistent or varying adjudications for individual members of the Class and of establishing incompatible standards of conduct for the parties opposing the Class.  Conflicting adjudications for individual members of the Class might be dispositive of the interests of the other members not parties to the adjudications, or substantially impair or impede their ability to protect their interests.  Therefore, a class action is superior to other available methods for the fair and efficient adjudication of this controversy.

187.    The questions of law and fact common to the members of the Class predominate over any questions affecting only its individual members, such that a class action is superior to any other available method for fairly and efficiently adjudicating the controversy.

## COUNT I

**Against Cornerstone, the Director Defendants, and the Officer Defendants for Violations of Section 14(a) of the Exchange Act and Rule 14a-9 Promulgated Thereunder**

188.    Plaintiffs incorporate each and every allegation set forth above as if fully set forth herein.

189.    Cornerstone, the Director Defendants, and the Officer Defendants disseminated a false and misleading Proxy containing statements that, in violation of Section 14(a) of the Exchange Act and Rule 14a-9, and in light of the circumstances under which they were made,

misrepresented or omitted material facts necessary to make the statements therein not materially false or misleading.

190.    The Proxy was prepared, reviewed, and/or disseminated by Cornerstone, the Director Defendants, and the Officer Defendants. Each of the Defendants authorized the dissemination of the Proxy, the use of their names in the Proxy, and were involved in the sales process leading up to the signing of the Merger Agreement.  By virtue of their positions within Cornerstone, these Defendants were aware of the misstated and omitted information alleged herein and their duty to make accurate statements and disclose all material information in the Proxy.

191.    Cornerstone, the Director Defendants, and the Officer Defendants were at least negligent in issuing a false and misleading Proxy.  Plaintiffs, while reserving all rights, expressly disclaim and disavow at this time any allegation in this Complaint that could be construed as alleging fraud against Cornerstone, the Director Defendants and the Officer Defendants in connection with this Count.  This claim sounds in negligence based on the failure of Defendants to exercise reasonable care to ensure the Proxy did not contain the material misstatements and omissions alleged herein.

192.    The omissions and false and misleading statements in the Proxy are material in that a reasonable shareholder would have considered them important in deciding how to vote on the Merger.  In addition, a reasonable investor would view a full and accurate disclosure as significantly altering the total mix of information made available in the Proxy and in other information reasonably available to Cornerstone shareholders.

193.    The Proxy was an essential link in causing Cornerstone shareholders to approve the Merger.

194.    Cornerstone, the Director Defendants, and the Officer Defendants solicited shareholder votes for a merger via a proxy statement they knew was defective and misleading.

195.    By reason of the foregoing, Cornerstone, the Director Defendants, and the Officer Defendants violated Section 14(a) of the Exchange Act and Rule 14a-9 promulgated thereunder.

196.    Because of the false and misleading statements in the Proxy, Plaintiffs and the Class were harmed by an uninformed shareholder vote approving the Merger.

197.    This claim is brought within the applicable statute of limitations.

**COUNT II**

**Against the CD&R Defendants, Sleeper, and Krenicki for
Violations of Section 20(a) of the Exchange Act**

198.    Plaintiffs incorporate each and every allegation set forth above as if fully set forth herein.in

199.    The CD&R Defendants acted as controlling persons of Cornerstone and culpably participated in the Proxy violations within the meaning of Section 20(a) of the Exchange Act as alleged herein.

200.    The Merger Agreement explains that "[t]he Company shall provide [Camelot] Parent with a reasonable opportunity to review drafts of the Proxy Statement and any other documents related to the Company Stockholders Meeting and will consider in good faith any comments provided by Parent in connection with such review."

201.    CD&R was a controlling person of Cornerstone because: (i) it had substantial ownership of Cornerstone given its beneficial ownership of 49% of the Company's outstanding stock; (ii) pursuant to the 2018 Stockholders Agreement it had the right to—and did—designate four CD&R partners or executives to Cornerstone's Board of Directors; and (iii) had control over many other Cornerstone directors who solicited votes in favor of the Merger including Affeldt,

Janki, and Reinsdorf, who, although not designated by CD&R to the Board directly, had longstanding relationships with CD&R and thus had influence over the Merger.    As a result, the CD&R Defendants had the ability to exercise control over and did control person(s) who violated Section 14(a) of the Exchange Act and Rule 14a-9, by their acts and omissions as alleged herein. By virtue of their positions as controlling persons, the CD&R Defendants are liable pursuant to Section 20(a) of the Exchange Act.  As a direct and proximate result of the conduct of the CD&R Defendants, Plaintiffs and the Class were harmed by an uninformed shareholder vote approving the Merger.

202.    Krenicki also acted as controlling person of Cornerstone and culpably participated in the Proxy violations within the meaning of Section 20(a) of the Exchange Act as alleged herein. In particular, Krenicki, as a director of Cornerstone since 2018, and partner and Vice Chairman of CD&R since 2013, had the ability to control the CD&R Funds which controlled Cornerstone. direct and supervisory involvement in the day-to-day operations of Cornerstone, and therefore had the power to control or influence the Merger giving rise to the Exchange Act violations alleged herein.

203.    Sleeper acted as a controlling person of Cornerstone and culpably participated in the Proxy violations within the meaning of Section 20(a) of the Exchange Act as alleged herein. In particular, Sleeper has been a director of Cornerstone since November 2018 and CEO of CD&R since 2000. In these roles, Sleeper had the direct and supervisory involvement in the day-to-day operations of Cornerstone, and thus had the power to control or influence the Merger giving rise to the Exchange Act violations alleged herein.

204.    The CD&R Defendants and Krenicki had the ability to and controlled the contents of the Proxy statement and therefore culpably participated in disseminating a false Proxy because

Camelot – a shell entity created by CD&R in February 2022 for the sole purpose of effectuating the Merger and over which CD&R had complete control – had, pursuant to the Merger Agreement, the right to review drafts of the Proxy Statement and any other documents related to the Company stockholders Meeting, and therefore CD&R, thorugh Camelot, controlled the contents of the Proxy statement and was a culpable participant in the false and misleading statements contained therein.

205.    Krenicki, as a CD&R partner, similarly had the right – through Camelot – to review drafts of the Proxy Statement and thus, Krenicki controlled the contents of the Proxy statement and was a culpable participant in the materially false and misleading statements contained therein.

206.    Like Krenicki, Sleeper, as CD&R's CEO had the ability—through Camelot—to review drafts of the Proxy statement. Therefore, Sleeper controlled the contents of the Proxy statement and was a culpable participant in the materially false and misleading statements contained therein.

207.    By virtue of the foregoing, the CD&R Defendants, Krenicki, and Sleeper have violated Section 20(a) of the Exchange Act.

208.    This claim is brought within the applicable statute of limitations.

## IX.    <u>PRAYER OF RELIEF</u>

WHEREFORE, Plaintiffs prays for judgment and relief as follows:

209.    Determining that this Action is a proper class action under Rule 23 of the Federal Rules of Civil Procedure;

210.    Declaring that Cornerstone, the Director Defendants and the Officer Defendants violated Section 14(a) of the Exchange Act, as well as Rule 14a-9 promulgated thereunder;

211.    Declaring that CD&R, Sleeper, and Krenicki violated Section 20(a) of the Exchange Act;

212.    Awarding damages in favor of Plaintiffs and the Class against all Defendants, jointly and severally, for all damages sustained as a result of Defendants' wrongdoing, in an amount to be proven at trial, including prejudgment interest thereon;

213.    Awarding restitution and equitable relief to Plaintiffs and the Class;

214.    Directing Defendants to account to Plaintiffs and the Class for all damages suffered as a result of their wrongdoing;

215.    Awarding Plaintiffs pre- and post-judgement interest and the costs of this Action, including reasonable allowance for Plaintiffs' attorneys' and experts' fees; and

216.    Granting such other and further relief as this Court may deem just and proper.

## X.    **<u>JURY DEMAND</u>**

Plaintiffs respectfully request a trial by jury on all issues so triable.

Dated: October 27, 2023                              Respectfully submitted,

By:    */s/ Christine M. Mackintosh*
       Christine M. Mackintosh (Bar No. 5085)
       **GRANT & EISENHOFER P.A.**
       123 Justison Street
       Wilmington, DE 19801
       Telephone: (302) 622-7081
       Facsimile: (302) 622-7100
       Email: cmackintosh@gelaw.com,

                              -and-

Daniel L. Berger (*pro hac vice* forthcoming)
Caitlin M. Moyna (*pro hac vice* forthcoming)
Cecilia Stein (*pro hac vice* forthcoming)
Mica A. Cocco (*pro hac vice* forthcoming)
**GRANT & EISENHOFER P.A.**
485 Lexington Avenue
New York, NY 10017
Telephone: (646) 722-8500
Facsimile: (646) 722-8501
Email: dberger@gelaw.com
         cmoyna@gelaw.com
         cstein@gelaw.com
         mcocco@gelaw.com

*Delaware Counsel for the Class*

Jeffrey S. Abraham (*pro hac vice* forthcoming)
Michael J. Klein (*pro hac vice* forthcoming)
**ABRAHAM, FRUCHTER & TWERSKY, LLP**
450 Seventh Avenue, 38th Floor
New York, NY 10123
Telephone: (212) 279-5050
Facsimile: (212) 279-3655
Email: jabraham@aftlaw.com
         mklein@aftlaw.com

*Lead Counsel for the Class*

Vincent R. Cappucci (*pro hac vice* forthcoming)
Jonathan H. Beemer (*pro hac vice* forthcoming)
Jessica A. Margulis (*pro hac vice* forthcoming)
**ENTWISTLE & CAPPUCCI LLP**
230 Park Avenue, 3rd Floor
New York, New York 10169
Telephone: (212) 894-7200
Facsimile: (212) 894-7272
Email: vcappucci@entwistle-law.com
         jbeemer@entwistle-law.com
         jmargulis@Entwistle-Law.com

*Counsel for the Water Island Funds and Member of
Plaintiffs' Executive Committee*